971 A.2d 1125

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Antoine LIGONS, Appellant.**

**Commonwealth of Pennsylvania, Appellant**

v.

**Antoine Ligons, Appellee.**

**Nos. 486 CAP, 487 CAP.**

Supreme Court of Pennsylvania.

Submitted Nov. 8, 2007.

Decided May 27, 2009.

110

Victor J. Abreu, Jr., Esq., Angela S. Elleman, Esq., Defender Association of Philadelphia, for Antoine Ligons (486 CAP).

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania (486 CAP).

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania (487 CAP).

Victor J. Abreu, Jr., Esq., Angela S. Elleman, Esq., Defender Association of Philadelphia, for Antoine Ligons (487 CAP).

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## *OPINION*

Justice BAER.

This case involves cross-appeals from the order of the Court of Common Pleas of Philadelphia County, which denied An-

toine Ligons' guilt phase claims under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546, but granted a new penalty hearing on the grounds that trial counsel was ineffective for failing to investigate mitigating evidence. For the reasons that follow, we affirm the denial of a new trial and reverse the grant of a new penalty hearing.

While the facts underlying Appellant's [1] conviction of first degree murder are set forth in our opinion affirming his judgment of sentence on direct appeal, *Commonwealth v. Ligons*, 565 Pa. 417, 773 A.2d 1231 (2001), a brief recitation thereof will facilitate an understanding of the issues raised herein.

On the evening of April 6, 1996, Appellant, then 19 years of age, was with his girlfriend, Irene Williams, on the porch of her home in West Philadelphia. Williams' home was located on the same street and within eyesight of Appellant's residence. Two brothers, Cecil and Edward Jackson, who lived next door to Williams, were also present at her home. At some point during the evening, Appellant left Williams' residence and returned to his own home. Shortly thereafter, he telephoned Williams and stated that he was going to do something and may not return. Williams then observed Edward Jackson carry an object wrapped in a jacket into Appellant's home. Moments later, Williams noticed Appellant leaving his residence, dressed entirely in black.

At nearly 10:45 p.m. that night, a caller telephoned Stavros Pizza to place an order to be delivered to an address located one block from Appellant's home.[2] Clarence Johnson, the deliveryman for Stavros Pizza, left at 11:30 p.m. with the completed order and $10.00 with which to make change. Mr. Johnson's wife, Sonja, accompanied him on the delivery. When Mr. Johnson arrived at the given address, he parked his vehicle in the middle of the street, where his wife waited in the car. As Mr. Johnson approached the porch of the residence,

1. While both the Commonwealth and Ligons are appellants in this matter, for purposes of this opinion, we shall refer to Ligons as "Appellant."

2. The caller did not identify himself or provide a telephone number.

Appellant emerged from an adjacent alley. Appellant was wearing all black clothing and a black ski mask that had a large opening around the eyes. Appellant approached Mr. Johnson from behind and pushed him onto the porch. While holding a gun to his head, Appellant stated, "You know what this is." When Mrs. Johnson opened the car door in an effort to help her husband, Appellant threatened to kill Mr. Johnson. Frightened, Mrs. Johnson remained in the car, which was parked seven to ten feet from where Appellant stood. Appellant demanded money and then pushed Mr. Johnson off the porch and into the alley. Mr. Johnson handed over the little cash he had and Appellant taunted him, repeatedly asking him whether he wanted to live. After Johnson pleaded for his life, Appellant fatally shot him in the back of his head and fled down the alley.

Upon hearing gunshots, nearby residents called the police, who arrived within minutes. Mr. Johnson was immediately taken to the hospital, where he was pronounced dead. Mrs. Johnson described the perpetrator to police as an African American male with a light complexion, hazel eyes, five feet eight inches in height, and weighing 150–160 pounds. She indicated that the robber wore a black ski mask, black Timberland boots, and black clothing. The police recovered a 9 mm. casing and a bullet that was consistent with either a .38 caliber or 9 mm. firearm.

After the shooting, Appellant telephoned Williams and explained that he may have just killed someone who had pulled a gun on him. In the days that followed, Appellant warned Williams not to report the incident and threatened her by stating, "I took a life and don't you think that I won't kill again." Fearing that Appellant might act on his words, Williams and her mother left the Philadelphia area to stay with Williams' cousin, Keith Wright, in Salisbury, Maryland. Upon learning of Williams' departure, Appellant telephoned Wright, whom he had previously known, in an attempt to speak with Williams. Appellant admitted to Wright that he had killed a man, and said that his motive was to obtain money to impress Williams. Appellant acknowledged that a woman

(Mrs. Johnson) witnessed the crime, but stated that he was not concerned because he had worn a mask during the incident.

Wright contacted the police, who traveled to Salisbury to interview him and Williams. Both Williams and Wright made statements to police in which they indicated that Appellant confessed to Johnson's murder. Williams additionally explained that a day or two before the murder, she overheard Edward Jackson mention that he had a gun and, on the night of the murder, saw Jackson carry an object wrapped in a jacket into Appellant's residence. Based upon this information, police obtained an arrest warrant for Appellant and search warrants for the residences of both Appellant and Edward Jackson. A search of Appellant's residence revealed a pair of black boots and a matchbook with the telephone number of Stavros Pizza written on the cover. Menus from Stavros Pizza were also recovered from the Jackson residence.

Appellant was subsequently arrested and charged with murder, robbery, and possession of an instrument of crime.[3] When questioned by police following his arrest, Appellant admitted that he robbed Johnson. He explained that he and his girlfriend had an argument, and that he thought that his girlfriend would stay with him if he gave her money. Appellant further stated that he needed money to pay his grandmother's medical bills. He asserted that, on the night of the murder, Cecil Jackson placed the pizza order and Edward Jackson supplied the gun. Appellant described the clothing that he wore during the commission of the crime, which was consistent with that reported by Mrs. Johnson. Appellant also claimed that he pointed his gun toward Mr. Johnson's head because Mr. Johnson threatened him with a gun. He stated that the next thing he knew, his gun discharged. Appellant denied taking any money.

Prior to trial, Appellant moved to suppress the statement he gave to police detectives on the grounds that the detectives fabricated the statement and beat him until he signed it,

3. Edward Jackson was not arrested in connection with the offenses.

causing injuries which required medical treatment. The trial court denied suppression, crediting the testimony of the police detectives that Appellant had the alleged injuries when he arrived for questioning, and that no physical force had been used by the detectives in eliciting Appellant's confession.

During *voir dire*, Appellant, who is African American, did not raise any claims of racial discrimination in jury selection under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). At trial in 1999, the Commonwealth presented Appellant's statement and the testimony of Williams, Wright, Mrs. Johnson,[4] and police detectives involved in the investigation. On direct examination, Williams recanted portions of her previous statement relating to Appellant's confession of the murder and the Commonwealth introduced her prior statement through the detective who interviewed her. Additionally, the Commonwealth presented expert testimony, establishing that Mr. Johnson died from a single gunshot wound, with the gun being fired from six to twelve inches from his head. The defense did not present any witnesses. Instead, the defense attacked the identification evidence linking Appellant to the crime, arguing that someone other than he committed the murder. On March 22, 1999, the jury found Appellant guilty of first degree murder, robbery, and possession of an instrument of crime.

During the penalty hearing on March 23, 1999, the Commonwealth alleged one aggravating circumstance, that Appellant committed a killing while in the perpetration of a felony, robbery, pursuant to 42 Pa.C.S. § 9711(d)(6) ("perpetration of a felony aggravator"). In support of this aggravator, the Commonwealth incorporated the record from the guilt phase of the trial and presented no additional evidence.

As mitigating circumstances, Appellant offered his lack of a significant history of prior criminal convictions, 42 Pa.C.S.

4. In addition to testifying to what occurred on the night of the murder, Mrs. Johnson unexpectedly testified that she had identified Appellant from a photograph array. The Commonwealth, however, presented testimony from a detective that photographic identification was not conducted and the trial court instructed the jury to view Mrs. Johnson's alleged photographic identification with caution.

§ 9711(e)(1) ("lack of significant criminal history mitigator"), his age at the time of the crime, *id.* at 9711(e)(4) ("age mitigator"), and other evidence of mitigation, *i.e,* life history and extenuating circumstances concerning the character and record of the defendant and the circumstances of his offense. *Id.* at § 9711(e)(8) ("catch-all mitigator"). In support of these mitigating circumstances, as discussed in detail *infra,* Appellant first presented the testimony of Williams, his mother, and his grandmother. Williams testified that she had a child with Appellant; that Appellant was a good father; and that he had never been violent. Appellant's mother testified about Appellant's difficult childhood in a crime-ridden neighborhood; his car thefts, which led to his being adjudicated a delinquent; his later success when in a structured environment, and his difficulties arising from his mother's intimate relationship with Cecil Jackson.[5] Appellant's grandmother testified that Appellant's mother never loved him and that Appellant was a nice person who never mistreated anyone. She also stated that, prior to the murder, she was in danger of losing her home due to her failure to pay medical bills, presumably hoping to corroborate Appellant's justification for the crime and to engender some sympathy for him.

Appellant further presented the testimony of Dr. Tepper, a licensed psychologist, who had conducted psychological testing on Appellant and interviewed Williams, Appellant's mother, and grandmother. Based upon the psychological testing and interviews, as well as Dr. Tepper's examination of police records and several reports and evaluations examining Appellant's background, Dr. Tepper testified that: Appellant had a difficult childhood in a rough neighborhood due to the absence of his father and the indifference of his mother; that his mother on occasion physically abused him; that he was in the low range of intelligence; that he excelled in the structured environment of the Glenn Mills School[6] after having been

5. Notwithstanding that Cecil Jackson was about the same age as Appellant, Cecil was Appellant's mother's paramour.

6. The Glenn Mills School is a private school for teen-aged males who have been adjudicated delinquent.

adjudicated delinquent for auto theft; that he maintained a caring relationship with his girlfriend and grandmother; that at the time of the offense, he was hurt by his mother's intimate relationship and cohabitation with his childhood friend, Cecil Jackson; and that he was concerned about his grandmother's health and ability to pay her medical bills.

In the closing arguments at the penalty hearing, the prosecutor referred to the evidence presented at trial that Appellant killed Johnson during a robbery to support the perpetration of a felony aggravator. Discounting the age mitigator, the prosecutor argued that, at age nineteen, Appellant was not so young and immature that age should be a mitigating factor. To rebut the lack of a significant criminal history mitigator, the prosecutor emphasized Appellant's previous juvenile adjudications for auto theft. Further, the prosecutor attempted to rebut the catch-all mitigating factor by noting that Appellant did not suffer any organic brain damage, was of average intelligence, and knew that what he did was wrong. Finally, the prosecutor requested that the jury consider the impact of the murder upon the victim's family.

On March 24, 1999, the jury returned a verdict of death, finding the perpetration of a felony aggravator and no mitigating circumstances. Trial counsel continued to represent Appellant on his direct appeal, in which he challenged Mrs. Johnson's alleged photographic identification and portions of the prosecutor's closing argument during the penalty phase. On July 6, 2001, this Court affirmed Appellant's judgment of sentence of death. *Commonwealth v. Ligons, supra.* The United States Supreme Court denied certiorari on October 7, 2002. *Ligons v. Pennsylvania,* 537 U.S. 827, 123 S.Ct. 122, 154 L.Ed.2d 40 (2002).

Appellant filed a timely *pro se* PCRA petition on January 13, 2003, challenging trial counsel's ineffectiveness for allegedly failing to investigate mitigation evidence.[7] New counsel

7. Appellant's judgment of sentence became final on October 7, 2002, the date the United States Supreme Court denied certiorari. *Commonwealth v. Yarris,* 557 Pa. 12, 731 A.2d 581, 586 (1999); 42 Pa.C.S. § 9545(b)(3). Accordingly, Appellant's PCRA petition, which was filed

("PCRA counsel") was appointed and, on September 15, 2003, an amended PCRA petition was filed. Therein, Appellant contended that trial counsel was ineffective for: failing to investigate adequately potential mitigating factors in his background, including his medical history and educational records; failing to preserve issues regarding the weight and sufficiency of the evidence; failing to preserve various objections to the testimony of Irene Williams and Keith Wright; failing to request a cautionary instruction concerning the testimony of the police detectives; failing to properly cross-examine the police detectives; and failing to demonstrate to the jury that Appellant did not fit into boots that had been seized from his home by the police detectives. Letter briefs were filed in support of the amended PCRA petition on September 12, 2003 and November 6, 2003. On March 2, 2005, Appellant filed a supplement to the Amended PCRA petition in which he included reports of Kirk Heilbrun, Ph.D., relating to additional mitigation evidence that could have been presented on Appellant's behalf.

The supplemental PCRA filings specifically contended that trial counsel was ineffective for failing to investigate the following documents: (1) a March 24, 1999 court-ordered mental health evaluation, which indicated no mental illness, but noted that Appellant felt rejected by his mother, was forced to live with his grandmother, and maintained several jobs; (2) a pre-sentence investigation report indicating that Appellant was only functionally literate, was dismissed from school in the 9th grade, and attended church; (3) Appellant's prison medical records which indicated that Appellant had no major psychiatric syndrome or anti-social personality disorder, had self-reported previous drug abuse, was placed on an anti-depressant while incarcerated as a result of the instant offense, and handled incarceration well; (4) Appellant's school records indicating vacillating academic performance, Appellant's failure of fourth grade, and his mother's inability to attend parent/teacher conferences; (5) Appellant's juvenile file

on January 13, 2003, was timely filed pursuant to 42 Pa.C.S. § 9545(b)(1).

("j-file"), which referenced that Appellant excelled in the structured setting of Glen Mills School, but was unable to adjust to probation after being released, as well as Appellant's history of juvenile offenses; and (6) documentation from Kirk Heilbrun, Ph.D., indicating that he could have testified in support of the age mitigator that Appellant was immature and lacked social skills and could have testified in support of the catchall mitigator regarding the specific details set forth in the aforementioned documents listed in items (1) through (5) above.

A PCRA evidentiary hearing was conducted on June 23, 2005, but no fact witnesses were presented by either party. Instead, the parties argued the merits of their positions regarding the issue of trial counsel's ineffectiveness for failing to investigate mitigation evidence.[8] In support of this claim, Appellant relied entirely upon the documentary evidence referenced above, as well as a July 27, 2003 letter written by trial counsel, which set forth his trial strategy.

At the conclusion of the hearing, the PCRA court denied the request for a new trial and granted a new penalty hearing on the ground that trial counsel was ineffective for failing to investigate relevant, mitigating evidence pursuant to the then-recent decision in *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (finding trial counsel ineffective for failing to investigate the court file concerning the defendant's prior conviction after the prosecution gave notice that it would be presenting testimony from the prior trial in support of the significant history of felony convictions aggravator).

Appellant thereafter presented to the court a *pro se* motion for the appointment of new counsel, which was time-stamped as having been received on June 30, 2005, but was never formally accepted for filing. Therein, Appellant asserted that he wanted his current PCRA attorneys removed from the case because they did not visit him in prison or investigate his case. Appellant further maintained that he wanted to raise a *"Hard-castle* issue," which, as discussed *infra*, is a claim of racial

8. As to the guilt phase issues, the parties relied on their briefs.

discrimination in jury selection based on *Hardcastle v. Horn,* 368 F.3d 246 (3d Cir.2004). On July 11, 2005, the parties appeared before the trial court and Appellant's counsel formally raised the *Batson* claim. On July 25, 2005, new counsel entered their appearance on behalf of Appellant and filed a timely notice of appeal.

In its August 4, 2005 opinion, the PCRA court addressed the guilt-phase issues included in Appellant's PCRA petition and denied relief on the merits. The court also addressed the "*Hardcastle* issue" and concluded that any claim of discrimination in jury selection was frivolous on its face because Appellant's jury consisted of 7 African Americans, 4 Caucasians, and 1 Latino. PCRA Court Opinion at 16. The court further explained that it had granted Appellant a new penalty hearing, holding that trial counsel was ineffective for failing to undertake a meaningful investigation of Appellant's background for purposes of presenting mitigation evidence in the penalty phase. *Id.* at 3.

█ As noted, both Appellant and the Commonwealth have appealed. This Court has jurisdiction over appeals from the grant or denial of post-conviction relief in a death penalty case pursuant to 42 Pa.C.S. § 9546(d). Our standard of review is whether the findings of the PCRA court are supported by the record and are free from legal error. *Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 593 (2007).

## I. *Cognizability of Claims*

█ In order to be eligible for PCRA relief, Appellant must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2)(setting forth the eligibility requirements of the PCRA). Further, Appellant must demonstrate that the issues raised in his PCRA petition have not been previously litigated or waived. *Id.* at § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the

124

issue." *Id.* at § 9544(a)(2). A PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." *Id.* at § 9544(b). Further, we no longer apply the relaxed waiver doctrine in capital PCRA appeals. *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 700 (1998).

Appellant raises several issues for review, many of which allege the ineffective assistance of counsel. It is well-established that counsel is presumed effective, and the defendant bears the burden of proving ineffectiveness. *Commonwealth v. Cooper,* 596 Pa. 119, 941 A.2d 655, 664 (2007). To overcome this presumption, Appellant must satisfy a three-pronged test and demonstrate that: (1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance. *Commonwealth v. (Michael) Pierce,* 567 Pa. 186, 786 A.2d 203, 213 (2001). A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any of these prongs. *Id.* at 221–222.[9]

In *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), this Court abrogated the rule that ineffectiveness claims based on trial counsel's performance must be raised at the first opportunity where appellant has new counsel, *see Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687, 695 n. 6 (1977), and held that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant,* 813 A.2d at 738. That holding, however, does not

9. In *Commonwealth v. (Charles) Pierce,* 515 Pa. 153, 527 A.2d 973 (1987), this Court recognized that the *Strickland* test was the proper test to evaluate ineffectiveness claims raised under the Pennsylvania Constitution. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While the Pennsylvania test for ineffectiveness is the same as *Strickland's* two-part performance and prejudice standard, in application, this Court has characterized the test as tripartite, by dividing the performance element into two distinct parts, *i.e.,* arguable merit and lack of reasonable basis. *Commonwealth v. Rainey,* 593 Pa. 67, 928 A.2d 215, 225 n. 8 (2007).

apply here because Appellant's direct appeal concluded prior to our decision in *Grant.* *Rainey,* 928 A.2d at 225. Thus, we shall analyze Appellant's ineffectiveness claims under the pre-*Grant* framework. *Id.*

■ As Appellant was represented by the same counsel at trial and on direct appeal, the first opportunity for him to challenge trial counsel's performance was on collateral review. Thus, no "layering" [10] is necessary as to the claims of trial counsel ineffectiveness that were raised in Appellant's PCRA petition. *See Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761, 775 n. 7 (2004) (providing that when appellant was represented by the same counsel at trial and on direct appeal, the PCRA proceeding is the first opportunity to challenge the stewardship of prior counsel and the analysis of such issue does not involve a layered claim of ineffectiveness).

However, the majority of Appellant's issues further allege PCRA counsel ineffectiveness for failing to raise certain substantive claims before the PCRA court in the proceedings from which this appeal was taken.[1112] Appellant is required to layer properly the claims of PCRA counsel ineffectiveness. In *Commonwealth v. McGill, supra,* this Court addressed the proper layering of a claim of ineffective assistance of counsel

10. The term "layering" refers to how a defendant presents seriatim claims challenging the effectiveness of counsel at sequential stages of criminal litigation. *See Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003). For instance, if a defendant asserts before this Court for the first time a claim that the trial court erred in its charge to the jury, he must demonstrate trial counsel's ineffectiveness in some fashion (*i.e.,* in failing to object), direct appeal counsel's ineffectiveness for failing to raise trial counsel's error on appeal, and PCRA counsel's ineffectiveness for failing to include the claim of trial counsel ineffectiveness in the defendant's PCRA petition. *Id.*

11. In the "Statement of Questions Presented" section of his brief, Appellant generally lists substantive claims of trial court and/or prosecutor error as Issues 1 through 7, and queries in Issue 8, "Were prior PCRA counsel ineffective for failing to properly raise the issues presented herein?" Appellant's Brief at 2. While Appellant sets forth no argument supporting Issue 8, he specifically addresses the ineffectiveness claims relating to each substantive claim, in varying detail and development, in the argument section, following discussion of the substantive issue.

12. For obvious reasons, such issues have never been examined below.

and held that a PCRA petitioner must present argument as to each layer of ineffectiveness, establishing all three prongs of the ineffectiveness standard for each attorney. *Id.* at 1022. Because this Court had not been entirely clear as to what was required of a PCRA petitioner seeking to plead and prove a layered claim of ineffectiveness before *McGill,* we stated that "a remand to the PCRA court may be appropriate for cases currently pending in the appellate courts where the petitioner has failed to preserve, by pleading and/or presenting, a layered ineffectiveness claim in a manner sufficient to warrant merits review." *Id.* at 1024. A remand is unnecessary, however, where the post-conviction petitioner fails to "thoroughly plead and prove" the underlying allegation that trial counsel was ineffective. *Commonwealth v. D'Amato,* 579 Pa. 490, 856 A.2d 806, 812 (2004).

We have held that a defendant in a capital case may challenge the stewardship of PCRA counsel on appeal to this Court because it is his only opportunity to do so. *Commonwealth v. Hall,* 582 Pa. 526, 872 A.2d 1177, 1182 (2005); *Commonwealth v. Pursell,* 555 Pa. 233, 724 A.2d 293 (1999); *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693 (1998). In *Albrecht,* we recognized that Pa.R.Crim.P. 904 embodies an enforceable right to effective PCRA counsel in a first PCRA petition and therefore we must permit claims challenging PCRA counsel's stewardship in an appeal to this Court. *Albrecht,* 720 A.2d at 699–700.

There has been some debate, however, regarding what level of development is necessary to entitle the petitioner to merits review of claims alleging the ineffectiveness of PCRA counsel. In *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33 (2002), we denied relief due to lack of development, holding that mere boilerplate assertions of PCRA counsel's ineffectiveness for failing to raise enumerated claims before the PCRA court were fatal to the claim. *Id.* at 41. Acknowledging our decision in *Bond,* we nevertheless declined to deny relief based upon a petitioner's failure to develop claims of PCRA counsel ineffectiveness in *Hall, supra.* Instead, this Court in *Hall* examined the merits of "those issues of [PCRA counsel]

ineffectiveness that are properly framed to determine whether there is any arguable merit to the claims of trial counsel ineffectiveness." *Id.* at 1183. This analysis was based on the fact that: (1) since *Bond* was decided, our Court in *McGill* acknowledged that the manner of properly layering a claim of ineffective assistance of counsel had been unclear and clarified the procedure for presenting layered claims; and, (2) the Commonwealth did not argue that the appellant's claims of PCRA counsel ineffectiveness were time-barred or should fail as undeveloped. *Hall,* 872 A.2d at 1183. We further noted that all of the appellant's claims of PCRA counsel's ineffectiveness would ultimately fail for lack of merit. *Id.*

We see no reason to deviate from *Hall,* as the Commonwealth's claims of waiver in the instant case relate to Appellant's failure to raise issues at trial, and do not suggest that claims of PCRA counsel ineffectiveness should fail because they are undeveloped or untimely. Further, Appellant's claims of PCRA counsel's ineffectiveness ultimately fail for lack of merit. Thus, consistent with *Hall,* we shall examine the merits of "those issues of ineffectiveness that are properly framed to determine whether there is any arguable merit to the claims of trial counsel ineffectiveness." *Id.* at 1183.

In his concurring opinion, Chief Justice Castille views a claim of PCRA trial counsel ineffectiveness as a new claim, which needs to be raised in a serial PCRA petition, and maintains that this Court lacks jurisdiction to address such "new" claims on appeal from the denial of PCRA relief. Consistently, he opines that, in addressing claims of PCRA counsel's ineffectiveness, we are applying a "no-waiver rule," which negates both judicial issue preservation principles as espoused in Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."), and the one-year filing requirement of the PCRA. *See* 42 Pa.C.S. § 9543(b)(1) (providing that "[a]ny petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final" unless the petitioner proves one of the exceptions to the time-bar, which are not at issue here).

While the concurring opinion's distinction is theoretically appealing, the practical application of such approach renders a PCRA petitioner's right to effective representation unenforceable and, therefore, meaningless. This consequence directly conflicts with controlling precedent of this Court that reaffirms that a PCRA petitioner has an enforceable right to effective assistance of counsel in a first PCRA petition. *See Albrecht; Pursell; Hall, supra.*

To illustrate the quandary that a capital PCRA petitioner faces when he receives deficient representation by PCRA trial counsel, we initially note that a petitioner can never abide by Pa.R.A.P. 302(a) when challenging PCRA trial counsel's performance because the first opportunity to raise such claim is in his appeal from the PCRA court's denial of relief. Stated differently, a petitioner cannot challenge PCRA counsel's effectiveness before the PCRA court because the alleged ineffectiveness is playing out as that proceeding occurs, and ineffectiveness cannot be identified until the proceeding has concluded. Similarly, absent invocation of one of the three statutory exceptions to the timeliness requirement set forth at 42 Pa.C.S. § 9545(b)(1)(i)-(iii), it would be virtually impossible for a petitioner to ever file a serial petition raising PCRA counsel's ineffectiveness in a timely manner as his first PCRA petition would not be disposed of before the one-year statutory filing period expires. *See Commonwealth v. Lark,* 560 Pa. 487, 746 A.2d 585, 588 (2000) (holding that when PCRA appeal is pending, subsequent PCRA petition cannot be filed until resolution of review of pending PCRA petition by highest state court in which review is sought, or at the expiration of time for seeking such review).

 Thus, the only way to afford a capital PCRA petitioner an opportunity to enforce his right to effective PCRA trial counsel is to permit the filing of such claims on appeal from the denial of PCRA relief. Admittedly, this puts our Court in the position of reviewing claims that were not reviewed by the PCRA court. However, there is no viable alternative to ensure that the right to effective PCRA counsel can be enforced and a remedy granted in the appropriate case where

the petitioner has satisfied the rigorous burden as announced in *McGill, supra,* of establishing a multiple-layered claim of ineffectiveness.

Purportedly recognizing the dire consequences arising from deeming all PCRA counsel ineffectiveness claims either waived or outside our jurisdictional reach, the concurring opinion poses alternatives a petitioner may pursue to enforce the right to effective PCRA counsel, other than in his appeal to this Court from the denial of PCRA relief, as occurred here. Concurring Opinion at 176, 971 A.2d at 1168. We find such suggestions laudable, but wholly inadequate. First, the concurring opinion suggests that the PCRA judge, who oftentimes is the same judge who presided over the petitioner's trial, "can direct counsel to amend or further develop claims, can conduct colloquies with the defendant, and can easily assess whether counsel is adequately discharging his duty." *Id.* This approach is unrealistic as the PCRA court has no way to identify or investigate collateral claims that do not appear on the face of the record (*e.g.,* a claim challenging trial counsel's failure to present sufficient mitigating evidence that existed at the time of the penalty hearing). Further, the petitioner, himself, is unable to understand the intricacies of the law in a manner sufficient to convey foregone claims to the PCRA court. Thus, the only way to bring final resolution to these case and to meaningfully consider whether PCRA trial counsel was, in fact, effective, is to follow the procedure set forth herein.

The concurring opinion additionally states that this Court "is also in a position, although from a different perspective, to assess the sort of effort counsel has made, and to take corrective action where it appears counsel has not completely discharged his duties." *Id.* at 176, 971 A.2d at 1168. We fail to see how our Court would be equipped to identify, investigate, and *sua sponte* raise such collateral claims. This alternative is clearly more violative of the judicial issue preservation principles set forth in Pa.R.A.P. 302 than the approach followed herein, where we address the claims of PCRA counsel ineffectiveness actually raised by the petitioner, himself.

It should be noted that our decision herein to address claims of PCRA counsel ineffectiveness is not new law; but rather is based on well-established case law of this Court. As noted, in *Albrecht,* we held that Pa.R.Crim.P. 904 (formerly Rule 1504) makes the appointment of counsel in PCRA proceedings mandatory. We stated:

> It is axiomatic that the right to counsel includes the concomitant right to effective assistance of counsel. Indeed the right to counsel is meaningless if effective assistance is not guaranteed.

*Id.,* 720 A.2d at 699–700, citing *Commonwealth v. Albert,* 522 Pa. 331, 561 A.2d 736, 738 (1989). Thus, our express holding was that a PCRA petitioner has an enforceable right to effective post-conviction counsel. 720 A.2d at 700. *Accord Pursell,* 724 A.2d at 302 (holding that our Court may review claims of ineffective assistance of PCRA counsel in a capital appeal from the denial of PCRA relief because it is the first opportunity to challenge the stewardship of PCRA counsel).

The concurring opinion suggests that these cases are no longer good law in that they represent the jurisprudence of this Court prior to our seminal decision in *Grant,* which abolished the rule that a defendant must raise claims of counsel's ineffectiveness at the first available opportunity when new counsel entered the case. This reasoning is flawed for two significant reasons. First, *Grant* did not involve a collateral appeal pursuant to the PCRA, and instead involved a direct appeal in which we abrogated the rule of law that previously required a defendant to raise a claim of ineffectiveness of counsel at the first opportunity, *i.e.,* on direct appeal. Simply put, *Grant* could not have overruled law regarding a PCRA petitioner's enforceable right to counsel, when it did not address such issue. Thus, we decline to hold that *Grant sub silentio* overruled the holdings of *Albrecht* and *Pursell,* which established that there is an enforceable right to effective assistance of counsel in a first PCRA petition. Secondly, we respectfully point out that our decision in *Hall* was decided in 2005, years after *Grant* was decided. Our Court was keenly aware of *Grant* when we ruled in *Hall* that the

petitioner could pursue his challenges to PCRA counsel's stewardship on appeal from the denial of PCRA relief. Thus, we are not only guided by *Hall*, but are bound by it.

The approach to examining claims of PCRA counsel ineffectiveness taken herein may not be ideal, but it is essential to preserve an enforceable right to effective PCRA counsel. Otherwise, we would be perpetrating little more than a myth that the right to effective PCRA counsel exists, when, in reality, such right would be illusory.

As Appellant's issues are each identified in varying levels of detail and development, we shall independently review each allegation to determine whether it is cognizable under the PCRA and whether it is properly framed to warrant merits review. We begin with the claims challenging Appellant's conviction of first degree murder.

## II. Batson Claim

Appellant's first claim is that his conviction should be vacated because the prosecutor exercised her peremptory strikes in a racially discriminatory manner in violation of *Batson v. Kentucky, supra.* The Commonwealth properly notes that this claim is waived as it was not raised at trial. 42 Pa.C.S. § 9544(b). Further, it was not raised in Appellant's PCRA petition, but was presented to the PCRA court after the request for a new trial was denied and a new penalty hearing was granted.

This does not end our discussion, however, because Appellant has raised in his appellate brief filed in this Court the separate issue of PCRA counsel's ineffectiveness for failing to properly raise and litigate in the PCRA court the issue of trial counsel's ineffectiveness for failing to raise the *Batson* claim. As this issue is properly framed pursuant to *Hall*, we shall determine whether there is any arguable merit to the claim of trial counsel ineffectiveness, which necessitates an examination of the underlying *Batson* claim.[13]

13. We further note that, in accordance with *McGill*, Appellant has properly developed the claim of PCRA counsel ineffectiveness as he analyzes the three prongs of the ineffectiveness test as it relates to each

132 
 

 In *Batson*, the United States Supreme Court held that a prosecutor's challenge of potential jurors solely on account of their race violates the Equal Protection Clause. 476 U.S. at 89, 106 S.Ct. 1712. *Batson* set forth a three-part test for examining a criminal defendant's claim that a prosecutor exercised peremptory challenges in a racially discriminatory manner. *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1042 (2002); *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race. *Id.* Second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue. *Id.* Third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination. *Id.*

 Generally, in order for a defendant to satisfy the first requirement of demonstrating a *prima facie Batson* claim, he must establish that he is a member of a cognizable racial group, that the prosecutor exercised peremptory challenges to remove from the venire members of his race,[14] and that other relevant circumstances combine to raise an inference that the prosecutor removed the jurors for racial reasons. *Harris*, 817 A.2d at 1042; *Batson* 476 U.S. at 96, 106 S.Ct. 1712. Whether the defendant has carried this threshold burden of establishing a *prima facie* case should be determined in light of all the relevant circumstances. *Id.*

layer of counsel's performance, including PCRA counsel's performance. *See* Appellant's Brief at 21–23 (specifically discussing the arguable merit, reasonable basis, and prejudice prongs of the ineffective assistance of counsel test as they relate to each layer of prior counsel's performance).

14. After *Batson* was decided, the United States Supreme Court held that, while racial identity between the excluded juror(s) and the defendant may be relevant in establishing a *Batson* violation, it is not a necessary requirement. *Powers v. Ohio*, 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). As Appellant is contending that the prosecutor exercised peremptory challenges to remove from the venire members of his race, the High Court's decision in *Powers* is not implicated here.

In cases like the one before us, however, where no *Batson* challenge was raised during the *voir dire* process, we have held that a post-conviction petitioner is not entitled to the benefit of *Batson's* burden-shifting formula, but instead, bears the burden in the first instance and throughout of establishing actual, purposeful discrimination by a preponderance of the evidence. *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 86 (2004.), citing *McCrory v. Henderson*, 82 F.3d 1243, 1251 (2nd Cir.1996) ("*Batson's* burden-shifting formula makes sense when applied to an objection raised sufficiently promptly that the attorney exercising the challenges can reasonably be expected to remember the reasons for the challenges. On the other hand, it would be altogether unreasonable to shift the burden of explanation if the objection is so tardily made that the challenging attorney cannot be reasonably expected to remember."). Additionally, in cases involving an unpreserved claim of discrimination in jury selection, this Court has generally enforced a requirement of a full and complete record of the asserted violation. *Uderra*, 862 A.2d at 83, citing, *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176, 1182–83 (1993). We have held that, under such circumstances, the defendant must present a record identifying the race of the venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected. *Id.*[15][16]

15. These particularized requirements of proof to support a prima facie case under *Batson* were criticized by the Third Circuit Court of Appeals in *Holloway v. Horn*, 355 F.3d 707 (3d Cir.2004), *cert. denied, Beard v. Holloway*, 543 U.S. 976, 125 S.Ct. 410, 160 L.Ed.2d 352 (2004), as being an "unreasonable application of federal law" that "places an undue burden upon the defendant." *Id.* at 728–29. Nonetheless, we have adhered to the procedural requirements criticized in *Holloway* as neither this Court nor the United States Supreme Court has explicitly overruled our long line of precedent mandating a full and complete record to establish a *Batson* violation. *Commonwealth v. Fletcher*, 580 Pa. 403, 861 A.2d 898, 910 n. 15 (2004); *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1212 n. 27 (2006).

16. Some members of this Court have noted their preference to eliminate the *Spence* procedural requirements. *See Uderra*, 862 A.2d at 87 n. 12; *Commonwealth v. Hackett*, 598 Pa. 350, 956 A.2d 978, 991–2 (2008) (Concurring Opinion, Saylor, J.). As we are not dismissing Appellant's

As noted, Appellant did not raise a *Batson* claim at trial, on direct appeal, or in his PCRA petition. Thus, the only viable claim for review is that of PCRA counsel ineffectiveness for failing to challenge trial counsel's omission in this regard. Due to this procedural posture, no evidentiary hearing has been conducted, although Appellant currently requests that we remand the matter for such a proceeding. To determine PCRA counsel's effectiveness, our inquiry at this juncture concerns whether Appellant's proffer, if believed, would establish actual, purposeful discrimination, *Uderra*, 862 A.2d at 87, and whether an evidentiary hearing is required on such claim. Pa.R.Crim.P. 907 provides that a PCRA petition may be denied without a hearing when the court determines "that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings...." Pa.R.Crim.P. 907(1).

Initially, we note that Appellant has complied with the *Spence* requirement by providing a full and complete record and has demonstrated that the prosecutor exercised 12 of her 20 available peremptory strikes against 9 African Americans, 2 Caucasians, and 1 Hispanic;[17] that all of the 11 venirepersons who were acceptable to the prosecution, but were struck by the defense were Caucasian; and that the final racial composition of the jury was 7 African Americans, 4 Caucasians, and 1 Hispanic, with the alternate jurors being 1 African American and 1 Caucasian.

In support of the *Batson* claim, Appellant makes several distinct arguments that require separate examination. He first asserts that he is an African American man and that the prosecutor engaged in a pattern of exercising her peremptory strikes primarily against African Americans. Relying on information garnered from the jury questionnaires, Appellant

claim for failing to comply with the procedural requirements of *Spence*, this case does not present the appropriate vehicle in which to examine the issue.

17. *See* Pa.R.Crim.P. 634(A)(3) ("In trials involving a capital felony and when there is only one defendant, the Commonwealth and the defendant shall each be entitled to 20 peremptory challenges.").

contends that 10 out of 12, or 83%, of the prosecutor's peremptory strikes were exercised against "people of color," when such individuals constituted only 51% of jury pool.

Appellant's calculations, however, are misleading. The record discloses that the prosecutor exercised 9 peremptory challenges against African Americans, but actually accepted 7 African Americans to serve on the jury panel, while having 9 of her 20 available peremptory challenges remaining. The prosecutor further accepted an African American as an alternate juror. While it is clear that the prosecutor peremptorily struck more African Americans than Caucasians, this fact, in and of itself, is insufficient to demonstrate purposeful discrimination when considering the totality of the circumstances. *See Commonwealth v. Cook,* 597 Pa. 572, 952 A.2d 594, 608 (2008) (holding that the racial composition of the jury and the race of the victim and of the defendant serve as circumstantial evidence relevant to evaluation of a *Batson* claim); *Spotz,* 896 A.2d at 1212–14 (holding that prosecutor's acceptance of 8 female jurors, 4 of whom were impaneled and 4 of whom were peremptorily struck by defense, were relevant factors in determining that defendant failed to demonstrate a *prima facie* case of gender discrimination); and *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 518 (1995) (holding that the presence of 6 females on the jury and 2 female alternates were relevant factors in determining that defendant failed to demonstrate a *prima facie* case of gender discrimination). Moreover, the record does not contain any questionable remarks made during jury selection that would indicate a motive to discriminate based on race, nor is this case racially sensitive as Appellant and the victim share the same race. *See Spotz,* 896 A.2d at 1213–1214 (in evaluating a *Batson* claim alleging gender discrimination, a court may look to whether the prosecutor made any questionable remarks during jury selection).

We further find that Appellant's proffer of additional allegations, if believed, is insufficient to establish actual, purposeful discrimination. Appellant contends: (1) that the pros-

ecutor improperly exercised a "for-cause" challenge against African American potential juror Shirley Morris; (2) that there were obvious reasons for the prosecutor's striking of Caucasian jurors, while African Americans Linda Lamar and Roxanne Tully were struck when they possessed characteristics that generally would be favorable to the Commonwealth; (3) that the same prosecutor who tried Appellant's case in 1999 engaged in discriminatory jury selection practices when she prosecuted Donald Hardcastle in 1982;[18] (4) that the prosecutor possessed personal notes in *Hardcastle* in 1982 and in *Commonwealth v. Tilley*, Dec. Term, 1985, Nos. 1078–82, which purportedly evidenced her consciousness of race during jury selection; (5) that Appellant's own statistical analysis of 23 unrelated homicide cases tried by his prosecutor indicates racially disparate exercise of peremptory challenges; and (6) that there was a "culture of discrimination" in the Philadelphia District Attorney's Office.[19]

18. In *Hardcastle v. Horn*, 368 F.3d 246 (3d Cir.2004), the Court of Appeals for the Third Circuit vacated the order of the district court, which had granted a new trial based on a *Batson* claim contained in the appellant's petition for a writ of *habeas corpus*. The Court of Appeals further remanded the matter for an evidentiary hearing to allow the Commonwealth to present evidence in support of its peremptory strikes of African Americans from the venire. *Id.* at 250. After the filing of Appellant's appellate brief in this Court, the evidentiary hearing was held in *Hardcastle* and, on October 19, 2007, the district court concluded that the prosecutor struck six potential jurors based on race in violation of the Equal Protection Clause of the Fourteenth Amendment. *Hardcastle v. Horn*, 521 F.Supp.2d 388 (E.D.Pa.2007). Appellant subsequently filed in our Court a Motion for Leave to Submit Supplemental Notice of Authority Relevant to an Issue on Appeal, in which he seeks to submit notice of the district court's 2007 ruling. While we grant Appellant's motion to submit notice of the decision, we find that the prosecutor's conduct in *Hardcastle's* 1982 trial, which was conducted prior to the United States Supreme Court's decision in *Batson*, has little, if any, relevance to the prosecutor's conduct during Appellant's trial in 1999.

19. As evidence of the alleged "culture of discrimination," Appellant relies on: (1) Philadelphia homicide prosecutions in other cases; (2) a statement by a judicial officer during the *Hardcastle* proceedings; (3) studies conducted by Professor David Baldus and others regarding racially discriminatory jury selection in Philadelphia; *see Racial Discrimination and the Death Penalty in the Post–Furman Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia,* David Baldus, George Woodworth, *et al.*, 83 Cornell L. Review 1638 (1998);

 These claims are not persuasive. The prosecutor's "for-cause" challenge exercised against African American Shirley Morris has no relevance to the prosecutor's exercise of peremptory challenges, particularly because Ms. Morris was ultimately excused by agreement of both parties.[20] Further unavailing is Appellant's claim that two African Americans, Linda Lamar and Roxanne Tully, were peremptorily struck when they "possessed characteristics that normally would be favored by the Commonwealth." Appellant's Brief at 14. The characteristics upon which Appellant relies are Ms. Lamar's employment as a civilian secretary for the Philadelphia Authority Police Department and Ms. Tully's employment by the Internal Revenue Service. These facts do not suggest that Ms. Lamar or Ms. Tully would necessarily be favorable to the Commonwealth or that the prosecutor's peremptory strikes of such individuals were improperly based on race.

 Additionally, the fact that Appellant's prosecutor was found to have violated *Batson* during the trial of Donald Hardcastle in 1982 is too tenuous to demonstrate that the prosecutor impermissibly struck jurors during Appellant's *voir dire* 17 years later, in 1999. In fact, the trial in *Hardcastle* occurred before *Batson* was even decided. Similarly irrelevant is the fact that Appellant's prosecutor may have kept notes in two unrelated cases in 1982 (*Hardcastle*) and in 1985 (*Tilley* ), which evidenced her consciousness of race during jury selection. We also find little value in Appellant's personal statistical analysis of 23 random and unrelated homicide cases tried by his prosecutor, which he maintains indicates

*The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis,* 3 U.P.Pa. J. Const. L. 3 (2001); (4) a 2003 report by the Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System; (5) a 1987 videotape of a lecture given by Philadelphia Prosecutor Jack McMahon advocating discrimination in jury selection; and (6) notes taken during a 1990 training lecture given by Bruce Sagel, which purportedly advocate the use of racial stereotypes in jury selection.

20. The Commonwealth's causal challenge was based on the fact that Ms. Morris' ex-husband was incarcerated for robbery, the same crime for which Appellant was charged, and because she displayed a "bad attitude." N.T. 3/16/99, at 207–08.

138

racially disparate exercise of peremptory challenges in those cases. Such assertions, individually and collectively, fail to demonstrate that the prosecutor engaged in purposeful discrimination in selecting the jury in Appellant's *case*.

 Finally, for this same reason, we conclude that Appellant's blanket claim of a "culture of discrimination" in the Philadelphia District Attorney's Office is insufficient to demonstrate purposeful discrimination as the various assertions do not involve the prosecutor who selected Appellant's jury and have no connection to his individual case. This Court has repeatedly rejected *Batson* claims based on generalized claims of bias or discrimination. *See Uderra*, 862 A.2d at 87 (rejecting proffer of McMahon tape in support of *Batson* claim because the training tape was substantially remote from the appellant's trial, both temporally and factually); *Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585, 588–89 (2000) (holding that the mere existence of the videotape of the lecture of Jack McMahon does not establish intentional discrimination in a particular case, nor does it relieve a PCRA petitioner of the burden of proving his claim under *Batson* ); *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 443 n. 10 (1999) (holding that mere existence of McMahon tape does not demonstrate that there was discrimination in selection of appellant's jury).

 Upon review of the totality of the circumstances, we conclude that, even if believed, Appellant's proffer fails to demonstrate that the prosecutor engaged in purposeful discrimination. Thus, neither Pa.R.Crim.P. 907 nor due process as a matter of law require an evidentiary hearing on the *Batson* issue. As the substantive *Batson* claim lacks arguable merit, trial counsel cannot be deemed ineffective for failing to raise it and Appellant's derivative claim of PCRA counsel's ineffectiveness fails. *Pursell*, 724 A.2d at 304.

### III. Brady Claim

Appellant next contends that his conviction should be vacated because the Commonwealth violated *Brady v. Maryland*,

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to disclose that, at the time of Appellant's trial, Edward Jackson had a pending charge of armed robbery that involved circumstances that were "remarkably similar" to Appellant's instant robbery offense.[21] The robbery leading to Jackson's criminal charges occurred three years after Appellant's offenses and purportedly arose from an armed assault of an individual on a Philadelphia street while Jackson was wearing a "dark Dickie jumpsuit," a ski mask, and Timberland boots. According to Appellant, such evidence would have supported his trial defense theory of misidentification and would have implicated Jackson in the instant offense.

The Commonwealth properly notes that Appellant's *Brady* claim is waived. 42 Pa.C.S. § 9544(b). The evidence allegedly withheld, *i.e.,* Edward Jackson's pending criminal charges, existed at the time of trial, was a matter of public record, and was therefore equally accessible to the defense. *See Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139, 1148 (2005) (holding that the Commonwealth has no obligation to provide a defendant with the criminal history of the victim where that record is equally accessible to the defense). Therefore, the *Brady* claim could have been raised on direct appeal, but was not.[22] Further, the *Brady* claim was not raised in Appellant's PCRA petition.

Relying on *Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167 (2000), Appellant asserts that his *Brady* claim cannot be waived because a waiver ruling would unjustly reward the Commonwealth for withholding information. *Strong,* however, does not stand for this proposition and, unlike the instant case, involved circumstances where the petitioner raised the *Brady*

21. The United States Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194.

22. For this reason, Appellant's *Brady* claim is likewise meritless because the Commonwealth had no obligation to disclose Edward Jackson's pending criminal charges to Appellant when such criminal records were equally accessible to the defense.

claim for the first time in his PCRA petition because he was unable to discover the basis of the *Brady* issue until the collateral stage of his proceedings. Moreover, Appellant's assertion that a *Brady* claim cannot be waived is inconsistent with the case law of this Court. *See Commonwealth v. Abdul–Salaam*, 570 Pa. 79, 808 A.2d 558, 560 (2001) (finding a *Brady* claim waived under the PCRA because the appellant could have raised the issue on direct appeal, but failed to do so); *Pursell*, 724 A.2d at 306 (same).

Alternatively, Appellant raises the separate claim that trial counsel had an obligation to discover Jackson's pending criminal charges and that he rendered ineffective assistance in failing to do so. He asserts that trial counsel did not have any tactical reason for failing to obtain this evidence because it was consistent with his defense of misidentification. Finally, Appellant alleges that he was prejudiced by trial counsel's omission because such evidence would have supported his misidentification defense, cast doubt on the Commonwealth's investigation, and undermined the Commonwealth's evidence of guilt.

This independent claim of trial counsel ineffectiveness is waived as Petitioner failed to raise it in his PCRA petition. Nevertheless, pursuant to *Hall*, Appellant has properly framed a claim of PCRA counsel ineffectiveness for failing to challenge trial counsel's effectiveness in this regard. To evaluate the issue of PCRA counsel ineffectiveness, we must examine the underlying claim of trial counsel ineffectiveness. We conclude that Appellant's claim of trial counsel ineffectiveness fails for lack of arguable merit because Edward Jackson's criminal offense occurred three years after Appellant's robbery and is completely unrelated to such offense. The mere fact that the two robberies occurred on a Philadelphia street and were committed by an individual wearing dark clothing in no way renders the two offenses so similar to one another and so distinctive from other crimes as to indicate that the same perpetrator committed both crimes. As we conclude that trial counsel was not ineffective for failing to discover Edward Jackson's pending criminal charges, Appellant's challenge to

PCRA counsel's effectiveness likewise fails. *Pursell,* 724 A.2d at 304.

## IV. Voluntariness of Appellant's Statement

Appellant next contends that the trial court erred in refusing to suppress his statement to the police, in which he confessed to robbing and murdering the victim. Prior to trial, Appellant moved to suppress his statement. As noted, at the suppression hearing, Appellant alleged that the police detectives fabricated the statement and beat him until he signed it. He further asserted that the beatings caused bruises and a black eye, which necessitated hospital treatment. The trial court denied suppression, crediting the testimony of the police detectives that Appellant had the alleged injuries when he arrived for questioning and that no physical force had been used by the detectives in eliciting Appellant's confession. Because Appellant did not challenge the suppression ruling on direct appeal or in his PCRA petition, the claim is waived. 42 Pa.C.S. § 9544(b).

Appellant, however, additionally argues that trial counsel was ineffective for: (1) failing to challenge the trial court's erroneous admission of the coerced statement; and (2) failing to present to the jury evidence establishing that his statement was physically coerced and therefore involuntary. These separate claims of trial counsel ineffectiveness were not raised in Appellant's PCRA petition and are therefore waived.

For purposes of addressing Appellant's properly framed derivative claims of PCRA counsel's ineffectiveness in this regard, we look to the claims of trial counsel ineffectiveness and the underlying substantive suppression issue. Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Eichinger,* 591 Pa. 1, 915 A.2d 1122, 1134 (2007). When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of

142

the defense as remains uncontradicted when read in the context of the record as a whole. *Id.* Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Id.*

We conclude that any challenge to the suppression ruling is meritless because the trial court made a finding of fact that the detectives did not use force in eliciting Appellant's confession and such finding was supported by the testimony of the police detectives. Appellant himself implicitly acknowledges this fact. Appellant's Brief at 31 ("all of the evidence *except the self-serving testimony of the detectives* shows that the statement was not voluntary") (emphasis added). Thus, the trial court did not err in refusing to suppress Appellant's confession on the ground that it was physically coerced and trial counsel was not ineffective for failing to challenge that ruling. Accordingly, PCRA counsel was not ineffective for failing to raise that issue in Appellant's PCRA petition.

We also are not persuaded by Appellant's claim that trial counsel was ineffective for failing to present to the jury evidence establishing that his statement was physically coerced. This claim is refuted by the record as Appellant specifically informed the trial court that he was aware of his right to present such evidence, but decided not to do so. The record demonstrates that at trial, before the defense rested, the trial judge colloquied Appellant regarding the strategy not to present evidence at trial challenging the voluntariness of his confession. Appellant indicated that he understood that he presented such evidence at the suppression hearing, that he had the right to do so again at trial, and that he decided not to present this evidence at trial after consultation with his attorney. N.T. 3/19/99, 25–26. Having made an informed decision not to present evidence challenging the voluntariness of his confession, Appellant cannot now fault trial counsel for failing to do so. *See Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 316 (2002), citing *Commonwealth v. Abu–Jamal,* 553 Pa.

485, 720 A.2d 79, 93 (1998), (holding that "a defendant who makes a knowing, voluntary, and intelligent decision concerning trial strategy will not later be heard to complain that trial counsel was ineffective on the basis of that decision.") As the claim of trial counsel ineffectiveness lacks arguable merit, the derivative claim of PCRA counsel ineffectiveness likewise fails.

### V. Failure to Investigate Mitigation Evidence

Having concluded that the guilt phase issues do not entitle Appellant to relief, we now entertain the penalty phase issues. Pursuant to the Commonwealth's appeal, we first address the claim upon which the PCRA court granted relief, i.e., that trial counsel was ineffective for failing to undertake a meaningful investigation of Appellant's background and/or failing to provide Dr. Tepper with the fruits of counsel's investigation to facilitate the effective presentation of mitigation evidence in the penalty phase. We reiterate that the penalty jury found one aggravating circumstance, that the offense was committed during the perpetration of a felony, and no mitigating circumstances.

Generally, the question of whether the PCRA court erred in its determination that trial counsel was ineffective for failing to investigate and present sufficient mitigating evidence depends upon a myriad of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented. *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 580 (2005); *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767 (2004). None of these factors, by itself, is dispositive of the question presented, because even if the investigation conducted by counsel was unreasonable, such fact alone will not result in relief if the defendant cannot demonstrate that he was prejudiced by counsel's conduct. *Collins,* 888 A.2d at 580.

In awarding a new penalty hearing, the PCRA court held that "the psychologist retained by trial counsel was not provided with [Appellant's] medical records, history of drug abuse,

school records, or juvenile background, hampering his ability to present an adequate case for mitigation." PCRA Court Opinion at 3. Relying on *Rompilla v. Beard, supra,* the court further held that "failing to investigate [Appellant's] childhood and juvenile convictions is not a rationale, tactical decision, as such evidence is well within what one would expect a reasonable attorney or mitigation expert to examine during the penalty phase of a capital trial for a young attorney." PCRA Court Opinion at 4. In regard to trial counsel's submissions to Dr. Tepper, the PCRA court found that trial counsel did not provide Dr. Tepper with the requisite tools to perform his job. *Id.* Finally, the PCRA court held that Appellant was prejudiced by counsel's omission because "the evidence not investigated or presented at trial may have both humanized [Appellant] and suggested that he would succeed in a structured correctional environment." *Id.* at 4. The PCRA court concluded that such evidence, which directly relates to the catchall mitigator, may have convinced at least one juror that Appellant's background outweighed the only aggravating circumstance found. *Id.* at 5.

The Commonwealth argues that the record simply does not support the PCRA court's determination that trial counsel failed to discover and/or disclose to the mental health expert Appellant's medical records, history of drug abuse, childhood background, and juvenile convictions. It asserts that there was no concession, stipulation, or any evidence establishing that these documents were not discovered and disclosed.[23] According to the Commonwealth, the record only reflects that Appellant's public school records were not provided to Dr. Tepper, and that fact alone does not carry Appellant's burden

---

23. The Commonwealth vehemently disputes Appellant's assertion that it expressly conceded at the PCRA evidentiary hearing that trial counsel's representation was deficient. Appellant's Reply/Answer Brief at 3. The PCRA evidentiary hearing transcript reveals that the Commonwealth only conceded that Dr. Tepper did not have Appellant's public school records. N.T. dated June 23, 2005, at 13. The Commonwealth stated that it was possible that Dr. Tepper did not receive Appellant's prison medical records or his juvenile or "j-file," but that it was not the Commonwealth's burden to prove these facts, and Appellant failed to prove what records Dr. Tepper actually reviewed. *Id.*

of proving that trial counsel lacked a reasonable basis for failing to investigate or disseminate necessary mitigation evidence to Dr. Tepper. The Commonwealth further maintains that Appellant has failed to demonstrate that he was prejudiced by trial counsel's performance as it is unlikely that the information in the school records would have caused the jury to return a life sentence. It concludes that Appellant should not be afforded a second opportunity to correct any defects of proof after failing to demonstrate trial counsel's ineffectiveness at the PCRA evidentiary hearing.

While these arguments challenge Appellant's evidence as to each of the three prongs of the ineffectiveness test, Appellant's claim may be denied if his evidence fails to meet any one of the three prongs. *Pierce*, 786 A.2d at 221–222. Thus, for purposes of discussion, we shall assume that there is arguable merit to the claim that trial counsel was ineffective for failing to investigate and provide to Dr. Tepper the records Appellant presented to the PCRA court. We shall further assume that trial counsel lacked a reasonable basis for failing to do so. Based on the following discussion, we conclude, however, that Appellant was not prejudiced by trial counsel's performance.

To establish prejudice in a case involving the failure to investigate and present mitigating evidence, we must consider not only the evidence and argument presented at the penalty phase, but also the evidence and argument that would have been presented at the penalty hearing had trial counsel properly investigated such evidence. *Malloy*, 856 A.2d at 789 (citation omitted). Prejudice is demonstrated when it is probable that at least one juror would have accepted at least one mitigating circumstance and found that it outweighed the aggravating circumstance found. *Id.* Here, as the following shows, the evidence overlooked is not of the nature or quality that would cause a juror to alter his or her verdict of death.

The documentary evidence presented to the PCRA court, which Appellant maintains should have been discovered by trial counsel and presented to the penalty jury, consists of: (1) a March 24, 1999 court-ordered mental health evaluation; (2) a

146

pre-sentence investigation report; (3) Appellant's prison medical records; (4) Appellant's public school records; (5) Appellant's juvenile or "j-file;" and, (6) correspondence from Dr. Heilbrun, including a January 20, 2005 evaluation and February 14, 2005 letter.[24]

Appellant maintains that these records would have provided mitigation evidence establishing that Appellant: felt rejected by his mother; suffered from mental health problems such as anxiety, tension, restlessness, and insomnia; was treated for such conditions while incarcerated for the instant offense; has difficulty reading; has "poor anticipatory planning and organizing skills;" has impaired insight; suffered from cognitive and learning problems as a child, which had been ignored by his mother; adapted well to juvenile and adult incarcerations; and demonstrated low levels of aggression.[25]

**24.** Appellant also submitted to the PCRA court a letter dated July 27, 2003, indicating that trial counsel did not obtain a prison adjustment record, but did subpoena Appellant's medical intake records for purposes of the suppression motion. The nature of the enumerated records is not explained in the correspondence.

**25.** To elaborate, the mental health evaluation concluded that Appellant *did not suffer from any mental illness.* It further noted that Appellant maintained several jobs, denied treatment for mental illness, and denied drug use. Appellant's pre-sentence report contains fundamentally the same information set forth in the mental health evaluation, including that Appellant was never treated for any mental disorder and denied using drugs. Appellant's prison medical records establish that Appellant self-reported drug abuse and that, while incarcerated after his conviction, he received *Sinequan, a prescription medication* for the treatment of anxiety and depression.

Appellant's school records demonstrate that Appellant's academic performance vacillated; that he failed 4th grade; that his mother did not appear at parent/teacher conferences or utilize services to improve her son's performance; and that Appellant ceased attending school in 9th grade because he began attending the Glenn Mills School after having been adjudicated delinquent. Appellant relied on his "j-file" for the proposition that he had poor reading ability; that while a 1994 psychological test indicated no major mental illness, it did confirm feelings of personal inadequacy, with a tendency to depression; that Appellant did not receive counseling; and was ultimately placed at Glenn Mills School, where he performed well in a structured setting.

Finally, Dr. Heilbrun's correspondence indicates that he could have presented testimony in support of the age mitigator, establishing that Appellant was 19 years old at the time of his offense and that adolescents of this age are often impulsive and more likely to display poor

Our independent review of the documentation presented to the PCRA court indicates that the evidence that trial counsel is faulted for overlooking fails to demonstrate any significant area of mitigation evidence that was not already explored by trial counsel and presented to the jury in some form. As noted, at the penalty hearing, Appellant's mother, grandmother, girlfriend, and a licensed psychologist testified in support of the three mitigation circumstances alleged: the lack of significant criminal history mitigator; the age mitigator; and the catch-all mitigator. Appellant's girlfriend, Irene Williams, testified that she has a fourteen-month-old child with Appellant, Notes of Testimony dated 3/23/1999, at 7; that Appellant is a very good father and is a nice person; *id.* 10; and that in the three years that she had known Appellant, she had never seen him act violently towards anyone. *Id.* at 11.

Appellant's mother, Carole Ligons, testified that Appellant grew up without a father or a father-figure in a neighborhood that was "buck wild," *id.* at 19, 22; that when Appellant was approximately thirteen, he got into trouble stealing cars and was sent to the Glenn Mills School for eighteen months; and that Appellant did well in the structured environment of the school. *Id.* at 22. Carole Ligons stated that Appellant achieved certificates of completion at the school in auto body shop and computer education, and received his GED. *Id.* at 32. She acknowledged, however, that two months after Appellant was released from Glenn Mills School, he was arrested for

judgment than people in their early 20's. Dr. Heilbrun opined that Appellant did not mature as a late adolescent due to his limited intellectual functioning and school difficulties. As to the catchall mitigator, Dr. Heilbrun indicated that he could have testified that Appellant measured at the borderline level of intellectual functioning; that his academic difficulties in school likely resulted from inconsistent parental supervision; that his home environment involved physical aggression such as his mother hitting him with a baseball bat; that Appellant wants to have a relationship with his young son, suggesting that he has some capacity for emotional attachment; and that Appellant is not a psychopath, which places him at a lower risk for disciplinary infractions in prison. Dr. Heilbrun discounted Appellant's self-report of drug abuse set forth in Appellant's prison medical records, finding that it was inconsistent with Appellant's response to the mental health evaluation and interviews of Appellant's mother, grandmother, and girlfriend, which all denied substance abuse.

stealing another car. *Id.* at 32. Carole Ligons further testified that in 1996, she began an intimate relationship with Appellant's childhood friend, Cecil Jackson; that she permitted Jackson to move into her home, *id.* at 23; that Jackson did not allow Appellant to come to his mother's home; and that Appellant therefore left his mother's home to live down the street with his grandmother. *Id.* at 24.

Appellant's maternal grandmother, Andrea Ligons, testified at the penalty hearing that Appellant is a nice, useful boy who never mistreated anyone. *Id.* at 43, 46. She explained that she has helped raise Appellant and cares for him very much, unlike Appellant's mother who has never loved him and, instead, cast him aside for her boyfriend, Cecil Jackson. *Id.* at 45. Andrea Ligons stated that, prior to the murder, she was in danger of losing her home because she could not afford to pay her medical bills arising from an extensive hospital stay. *Id.* at 49.

Finally, trial counsel presented the testimony of licensed psychologist, Dr. Allen Tepper. Regarding the basis for his opinion, Dr. Tepper explained that he reviewed police reports of the incident, *id.* at 55, and a number of other "background reports or evaluations which may have been done in the past." *Id.* at 56. Dr. Tepper stated that he had interviewed Appellant and conducted psychological testing on him and also interviewed Appellant's girlfriend, mother, and grandmother. *Id.* The only records that Dr. Tepper expressly stated that he did not receive from trial counsel were Appellant's school records. *Id.* at 56.

Based upon his review of the foregoing, Dr. Tepper asserted that Appellant was raised without a father-figure and began exhibiting childhood behavioral problems soon after he began inquiring about his father. *Id.* at 59. He acknowledged the poor relationship between Appellant and his mother and referenced incidents during Appellant's childhood when his mother physically struck Appellant with a baseball bat, a chair, and a broom. *Id.* at 65. While Dr. Tepper found Appellant to be in the low to average range of intelligence, he noted that Appellant had excelled in the structured environment of the Glenn

Mills School. *Id.* at 60. He explained that when Appellant committed the murder, he was feeling abandoned and was having difficulty with his mother's intimate relationship with Cecil Jackson, who became his rival. *Id.* at 61. Appellant's grandmother was also gravely ill. *Id.* Dr. Tepper further opined that Appellant had no severe mental illness or psychosis and did not suffer from an organic brain injury. *Id.* at 62, 67. He recognized, however, that Appellant had been treated in recent months, purportedly while incarcerated, for stress and depressive mood. *Id.* at 63.

We have little difficulty concluding that the evidence presented during the penalty phase did not materially differ from the evidence that trial counsel allegedly failed to investigate and provide to its mental health expert. Both the evidence presented and that allegedly overlooked portrayed Appellant as a non-violent, caring person who had a difficult childhood without a father in a rough neighborhood, who was never loved by his mother, and who excelled in a structured environment. Under these circumstances, we are not convinced that, had such evidence been presented, at least one juror would have accepted at least one mitigating circumstance and found that it outweighed the perpetration of a felony aggravator.

Additionally, we find that the quality and nature of the mitigation evidence that trial counsel purportedly failed to present renders this case factually distinguishable from *Rompilla v. Beard,* upon which Appellant and the PCRA court relied. In *Rompilla,* the United States Supreme Court granted the defendant a new penalty hearing because trial counsel was ineffective for failing to present sufficient mitigation evidence. The High Court recognized that trial counsel failed to investigate school records, files from the defendant's juvenile and adult incarcerations, and the defendant's history of alcohol dependence.

The Supreme Court, however, focused upon the fact that trial counsel failed to investigate the file from the defendant's previous conviction, after the prosecution had given the defense notice that it would be presenting the actual testimony from the trial of such conviction to support its contention that

the defendant's past implicated the significant history of felony convictions aggravator. *Id.* at 383, 125 S.Ct. 2456. The Court emphasized that trial counsel's obligation to review the court file was particularly pressing because of the similarity between the prior offense and the crime charged. The Court concluded that without making reasonable efforts to assess the file from the prior trial, trial counsel was unaware whether the prosecution was quoting selectively from its transcript, or whether there were extenuating circumstances, militating against the applicability of the significant history of felony convictions aggravator. *Id.* at 386, 125 S.Ct. 2456. Finally, the Court noted that, if trial counsel had obtained the file from the defendant's prior conviction, he would have uncovered other mitigation evidence that bore no relation to the few naked pleas for mercy trial counsel actually put before the jury. *Id.* at 393, 125 S.Ct. 2456.

We find that *Rompilla* does not control this case because the evidence trial counsel is faulted for overlooking was not intended to contradict the evidence the Commonwealth presented in support of its only proffered aggravator, as was the case in *Rompilla;* nor would it have led to wholly new material mitigation evidence. Rather, the allegedly undiscovered or undisclosed evidence in this case did not so materially differ from the evidence actually presented to the penalty jury, that we can find prejudice to Appellant arising from counsel's failure to discover or disclose it. In other words, we find that the evidence proffered by Appellant would have primarily been cumulative to that which was in fact presented. Thus, the PCRA court erred in relying on *Rompilla* to grant Appellant a new penalty hearing.

Appellant's reliance on *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), is likewise misplaced as those cases involve factual circumstances where the mitigating evidence that trial counsel failed to present to the sentencing jury drastically differed from the mitigating evidence actually presented at the penalty phase. In *Williams,* the defendant was convicted of capital murder

for the beating death and robbery of a man while in his residence. At the sentencing hearing, trial counsel presented the testimony of the defendant's mother and two neighbors, who briefly described him as a "nice boy" and not a violent person. *Williams*, at 369, 120 S.Ct. 1495. Trial counsel also presented a recorded excerpt from a psychiatrist's statement, which indicated that during the commission of an earlier unrelated robbery, the defendant had removed bullets from a gun so as not to injury anyone. Further, in cross-examination and in his closing argument, trial counsel emphasized that the defendant had initiated the contact with the police that enabled them to identify him as the perpetrator, and cooperated with the police thereafter. *Id.*

The mitigation evidence that trial counsel was faulted for not investigating in *Williams* demonstrated the defendant's deplorable living conditions as a child, the fact that his parents had been imprisoned for neglecting him and his siblings, that the defendant had been severely and repeatedly beaten by his father, had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one period in an abusive foster home), and had been returned to his parents upon their release from prison. *Id.* at 395, 120 S.Ct. 1495. Trial counsel in *Williams* further failed to introduce available evidence that the defendant was "borderline mentally retarded," that he did not advance beyond sixth grade in school, that he cooperated with prison officials to uncover a prison drug ring, and that he thrived in the structured environment of the prison. *Id.* at 396, 120 S.Ct. 1495.

Due to the great disparity between the nature and quality of mitigation evidence overlooked as compared with the scant mitigation evidence actually presented, the High Court concluded that counsel's unprofessional service prejudiced the defendant within the meaning of *Strickland. Williams* at 396, 120 S.Ct. 1495. To the contrary, as demonstrated *supra,* such prejudice is lacking in the instant case as the evidence presented during Appellant's penalty phase did not materially

differ from the evidence that trial counsel allegedly failed to investigate and provide to his mental health expert.

The United States Supreme Court's decision in *Wiggins* is likewise distinguishable. The defendant in *Wiggins* was convicted of first degree murder and theft offenses after a 77–year–old woman was found drowned in her bathtub in her ransacked apartment. At the sentencing hearing in *Wiggins,* trial counsel discounted the defendant's direct responsibility for the murder, emphasized his lack of criminal history, and presented the testimony of a criminologist, suggesting that inmates serving life sentences tend to adjust well and refrain from further violence in prison. *Id.* at 526, 123 S.Ct. 2527. No evidence whatsoever was presented demonstrating the defendant's life history. Specifically, trial counsel failed to present evidence indicating the absolute neglect and severe physical abuse the defendant suffered during his childhood at the hands of his mother, who was a chronic alcoholic who left Wiggins and his siblings at home alone for days, forcing them to beg for food. *Id.* at 516–17, 123 S.Ct. 2527. Trial counsel further failed to present evidence of the repeated molestation and rapes the defendant endured while in the care of a series of foster parents, and the fact that the defendant ran away from such foster homes and began living on the streets at the age of 16. *Id.* at 517, 123 S.Ct. 2527. Finally, trial counsel failed to present evidence that, after leaving the foster care system, the defendant was sexually abused by a Job Corps program supervisor. *Id.*

The United States Supreme Court in *Wiggins* concluded that had the jury been confronted with the considerable mitigation evidence that was omitted, there is a reasonable probability that it would have returned with a different sentence. *Id.* at 536, 123 S.Ct. 2527. The same cannot be said of the instant case. Here, Appellant faults trial counsel for failing to present evidence that he felt rejected by his mother, had both confirmed and denied drug use, had poor academic performance in grade school leading to his failure of fourth grade, was immature, lacked social skills, and excelled in a structured environment. We reiterate that trial counsel had

already presented to the sentencing jury evidence that Appellant was never loved by his mother, had a difficult childhood without a father in a rough neighborhood, was in the low to average range of intelligence, and excelled in the structured environment of the Glen Mills School. Under these circumstances, the United States Supreme Court's decision in *Wiggins* offers Appellant no relief.

Considering the possibility that this Court may ultimately reverse the PCRA court's grant of a new penalty hearing premised upon trial counsel's ineffectiveness, Appellant further raises the independent layered claim that PCRA counsel was ineffective for failing to provide the PCRA court with the full range of mitigating evidence that was available to support the claim of trial counsel ineffectiveness. Appellant maintains that if we reverse the PCRA court's grant of a new penalty hearing, he is at least entitled to an evidentiary hearing on the claim of PCRA counsel's ineffectiveness in litigating trial counsel's ineffectiveness. In support of the claim of PCRA counsel ineffectiveness, Appellant presents a variety of records and reports, which were not presented to the PCRA court,[26] which, in turn, allegedly support the claim of trial counsel ineffectiveness.

26. Specifically, Appellant presents a report drafted by Dr. Jonathon Mack, dated June 26, 2006, one year after Appellant's PCRA hearing was conducted. The report indicates that Appellant suffers from anxiety disorder and irritable bowel syndrome; had "brain damage/significant neurocognitive, and emotional deficits" at the time of the offense, which resulted from his suffering two concussions in 1997 and mild head trauma when he was a small child; and that such evidence may qualify under the catchall mitigator and 42 Pa.C.S. § 9711(e)(3) (providing that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"), but that the (e)(3) mitigator is "more problematic to state" as Appellant denies culpability.

Appellant further presents an unsigned and undated declaration from Dr. Tepper, indicating that he requested Appellant's juvenile file, school records, and prison institution report and never received it; that the limited information provided to him precluded him from being able to conduct an adequate mitigation evaluation; and that he concurs with Dr. Mack's findings of possible brain damage due to serial concussions.

Finally, Appellant presents Department of Public Welfare records, which indicate that Appellant excelled in a structured setting and not in his home environment; medical records relating to Appellant's 1997

154 

 As noted, generally a layered ineffectiveness claim cannot be sustained where the underlying claim lacks merit. *See McGill,* 832 A.2d at 1024–25. Here, however, Appellant alternatively complains that the underlying claim of trial counsel ineffectiveness lacks merit, not because it is frivolous, but solely because PCRA counsel failed to present sufficient mitigating evidence to support it. Appellant's claim, however, misses the mark. The mere fact that PCRA counsel did not ultimately succeed does not establish that his performance during the collateral proceeding was unreasonable or that he was ineffective. Appellant himself repeatedly referenced the extensive documentation PCRA counsel provided his expert, Dr. Heilbrun. *See ex.* Reply/Answer Brief of Appellant at 11 ("PCRA counsel produced volumes of records that had not been provided to Dr. Tepper."). In fact, Dr. Heilbrun's report indicated that PCRA counsel provided him with 29 documents. Appellant's argument that such efforts were ineffective is not persuasive. Moreover, Appellant has not demonstrated that PCRA counsel lacked a reasonable basis for submitting to the PCRA court the above detailed extensive mitigating evidence, instead of the different, but not more extensive mitigation evidence offered in Appellant's brief to this Court. We find that Appellant's claim of PCRA counsel ineffectiveness utterly fails when considered in light of the extensive and laudatory efforts by that counsel. Consequently, Appellant is not entitled to an evidentiary hearing for further development of the post-conviction record pursuant to Pa.R.Crim.P. 907.

## VI. Death Qualification of Jury

 Appellant next contends that his death sentence should be vacated because he was tried by an improperly "death-qualified" jury in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Commonwealth properly notes that this claim is waived as it

concussions, which indicate that they resulted from beatings by Cecil and Edward Jackson; court documents relating to the assaults by the Jackson brothers; and domestic violence records from Dade County Florida, indicating that Appellant's father physically abused Appellant's sister prior to Appellant's birth.

was not raised at trial.[27] 42 Pa.C.S. § 9544(b). Further, it was not raised in Appellant's PCRA petition. Appellant, however, additionally claims that trial counsel was ineffective for failing to object to the trial court's "death-qualification" of the jury and that PCRA counsel was ineffective in failing to challenge trial counsel's performance in his PCRA petition. As the issue of PCRA counsel ineffectiveness is properly framed pursuant to *Hall*, we shall determine whether there is any arguable merit to the claim of trial counsel ineffectiveness. In order to do so, we examine the underlying *Witherspoon* claim.

In *Witherspoon*, the United States Supreme Court held that a sentence of death cannot be carried out if the jury that imposed it was chosen by methods which excluded venirepersons for cause simply because they voiced general objections to the death penalty. The High Court explained that "[u]nless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." *Id.* at 515 n. 9, 88 S.Ct. 1770 (internal citations and quotation marks omitted).

In the instant case, the trial judge asked the three panels of venire the following question:

> For the purposes of the question, I am asking you to assume that the Defendant is found guilty of Murder in the First Degree and that you have heard additional evidence and additional legal arguments and additional charges by me, the Judge, and after hearing all of this, you are convinced that an appropriate case for the death penalty has been made out; under those circumstances, would any of you be unable to vote for the death penalty; in other words, would you have any religious, moral or conscientious objections to the imposition of the death penalty in a proper case?

27. To the contrary, when asked by the trial court, defense counsel indicated that he had no objection to death qualifying the jurors. N.T. 3/15/99 at 2.

N.T. 3/15/1999, at 7, 71; N.T. 3/16/1999 at 6. All of the jurors who answered the question affirmatively were dismissed for cause. Appellant asserts that this jury selection process violated *Witherspoon* because the dismissed venirepersons did not state that they would be unable to follow the court's instructions regarding imposition of the death penalty, but only voiced "general objections" to the death penalty. This claim is not persuasive. By responding affirmatively to the court's inquiry, the venirepersons clearly indicated that they were unable to vote for the death penalty in an appropriate case. Thus, the trial court did not violate *Witherspoon* when it struck such venirepersons for cause. *See Commonwealth v. Jones,* 912 A.2d at 286 (holding that the trial court properly dismissed juror who testified that she would be unable to impose the death penalty); *Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 442 (1999) (holding that the trial court properly struck jurors who indicated that their views on the death penalty would make them unable to apply the law as instructed to them by the judge).

As the substantive *Witherspoon* claim is meritless, trial counsel cannot be deemed ineffective for failing to raise it and Appellant's derivative claim of PCRA counsel's ineffectiveness fails. *Pursell,* 724 A.2d at 304.

### VII. *Prosecutorial Misconduct at Penalty Stage*

Appellant next contends that his death sentence should be vacated due to the following allegations of prosecutorial misconduct during the penalty phase: (1) that the prosecutor made a victim impact argument[28] without having presented victim impact evidence and after having indicated

---

28. Appellant relies on the following statement made in the prosecutor's closing argument:

> What you heard today revolved around one person, the defendant. You heard nothing about Clarence Johnson today but you must remember that this case really is about Clarence Johnson and the fact that he did not have opportunities to be with his family, to be with his children, to be with his wife, mother, brothers, sister, after this incident. He was only 32 years old. He was trying to make a living. He was trying to earn whatever you could earn as a pizza deliveryman.

N.T. 3/23/99 at 77–78.

that there would be no victim impact presentation;[29] (2) that the prosecutor improperly urged the jury to disregard the age mitigator in violation of due process and the 8th Amendment to the United States Constitution.

Appellant's first claim of prosecutorial misconduct is not cognizable under the PCRA because it was previously litigated on direct appeal. 42 Pa.C.S. § 9543(a)(3). As noted, a claim has been previously litigated for purposes of the PCRA if "the highest appellate court in which the petitioner was entitled to review as a matter of right has ruled on the merits of the issue." *Id.* at 9544(a)(2). *See Ligons,* 773 A.2d at 1238–39 (rejecting Appellant's claim that the prosecutor's closing argument in the penalty phase improperly interjected victim impact evidence into the case). To the extent that Appellant also raises an ineffectiveness claim arising from counsel's failure to object to the prosecutor's references to victim impact evidence, *see Commonwealth v. Collins,* 888 A.2d at 573 (holding that, for purposes of the PCRA's previous litigation bar, a Sixth Amendment claim of ineffectiveness raises an issue distinct issue from the underlying substantive claim), we find the ineffectiveness claim to lack arguable merit because the prosecutor's argument did not constitute victim impact evidence, but rather was a permissible response to Appellant's mitigation evidence.

Appellant's second claim of prosecutorial misconduct is waived because it was not raised at trial. 42 Pa.C.S. § 9544(b). Further it was not presented in Appellant's PCRA petition. Appellant, however, additionally claims that trial counsel was ineffective for failing to object to the prosecutor's argument to disregard the age mitigator and that PCRA counsel was ineffective in failing to challenge trial counsel's performance in his PCRA petition. As the issue of PCRA counsel ineffectiveness is properly framed pursuant to *Hall,* we shall determine whether there is any arguable merit to the

29. Appellant concedes that victim impact evidence was admissible at Appellant's sentencing hearing pursuant to 42 Pa.C.S. § 9711(a)(2) (providing that "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible").

claim of trial counsel ineffectiveness. In order to do so, we examine the underlying claim of prosecutorial misconduct.

In considering a claim of prosecutorial misconduct, our inquiry "is centered on whether the defendant was deprived of a fair trial, not deprived of a perfect trial." *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 231 (1995) (citing *Commonwealth v. Holloway*, 524 Pa. 342, 572 A.2d 687, 693 (1990)). Thus, a prosecutor's remarks do not constitute reversible error unless their unavoidable effect was to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that the jury could not weigh the evidence objectively and render a true verdict. *Commonwealth v. Bond*, 539 Pa. 299, 652 A.2d 308, 315 (1995). Further, the allegedly improper remarks must be viewed in light of the entire context of the closing argument as a whole. *LaCava*, 666 A.2d at 235.

Here, Appellant submitted the age mitigator to the jury at the penalty phase and argued that his youth at the time of the murder militates against imposing the death sentence. N.T. 3/23/99 at 4, 86–87.[30] Appellant argues that the prosecutor, however, improperly told the jury to disregard the mitigating effect of Appellant's youth. The prosecutor stated:

> I submit to you, ladies and gentlemen, that the age of the Defendant at that time was not so young and that he was not so immature that age should be a factor. He wasn't fourteen or fifteen years old at the time. He was a man. He was nineteen years old. He was old enough to serve in the armed forces; old enough to vote; old enough to serve on a jury.

N.T. 3/23/99, 82. Appellant contends that this argument violated the 8th and 14th Amendments to the United States

---

**30.** In support of the age mitigator, trial counsel argued as follows:

> [Appellant] just turned nineteen years old when this incident took place but the Court and the law looks at youth in a little different way, the same way as it looks at a man's age. They are under difference [sic] influences. This is not a mature twenty-five or thirty-five-year-old man who decided I have nothing better to do tonight than to go out and kill somebody.

> N.T. 3/23/99 at 87.

Constitution because it precluded the jury from considering his youth as mitigating evidence and distorted the meaning of the age mitigator.

We disagree as the prosecutor did not inform the jury that it was precluded from considering Appellant's youth as mitigation evidence, but only that it should not do so under the facts presented. Viewed in the context of the closing argument as a whole, the prosecutor's comments were permissible as argument supporting the death penalty. *See Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761, 800 (2004) (prosecutor's argument that defendant's age should not be a determinative factor was permissible because it was in response to defense evidence and argument); *Commonwealth v. Stokes,* 576 Pa. 299, 839 A.2d 226, 233 (2003) (holding that it is not improper for the prosecution to ask the jury to reject defendant's age as a mitigating factor); *Commonwealth v. Dennis,* 552 Pa. 331, 715 A.2d 404, 415 (1998) (same). Moreover, the trial court specifically instructed the jury that it was to determine, based on the facts, whether the age mitigator applied. *See* N.T. 3/23/99 at 99–100 ("the evidence is incontrovertible that [Appellant] was nineteen years of age at the time of the crime; accordingly, it is for you to determine from the facts whether or not [Appellant's] age constitutes a mitigating circumstance").

Accordingly, the claim of prosecutorial misconduct is meritless and trial counsel cannot be deemed ineffective for failing to raise it. Under these circumstances, Appellant's claim of PCRA counsel ineffectiveness fails. *Pursell,* 724 A.2d at 304.

### VIII. Racial Discrimination in Death Sentence

Finally, Appellant maintains that his death sentence should be vacated because it is a product of racial discrimination in violation of the United States and Pennsylvania Constitutions, Pennsylvania's Sentencing Statute, and International Law. In support of this claim, Appellant relies on various items of documentary evidence that are completely unrelated to his individual case. He maintains that, at the very least, he is entitled to an evidentiary hearing. Appellant's racial dis-

crimination claim, however, is waived because it was not raised on direct appeal. 42 Pa.C.S. § 9544(b). Further it was not presented in Appellant's PCRA petition. Appellant, however, additionally claims that trial counsel was ineffective for failing to raise the issue and that PCRA counsel was ineffective in failing to challenge trial counsel's performance in this regard. As the issue of PCRA counsel ineffectiveness is properly framed pursuant to *Hall*, we shall determine whether there is any arguable merit to the claim of trial counsel ineffectiveness.

We find that such claim clearly lacks arguable merit as this Court recently rejected nearly the identical claim in *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790 (2007), wherein we stated:

> In this case, Appellant only proffers statistics and generalized claims that the death penalty is applied in Philadelphia County in a racially discriminatory manner. He has not set forth any evidence to show that the allegedly pervasive discriminatory atmosphere affected *his individual case*. Mere allegations of general bias and statistics are not sufficient to meet the burden of proving discrimination as to Appellant's case. As such this claim fails.

*Id.* at 822 (emphasis supplied).

Thus, the claim of racial discrimination is meritless and trial counsel cannot be deemed ineffective for failing to raise it. Accordingly, the claim of PCRA counsel ineffectiveness fails. *Pursell*, 724 A.2d at 304.

Accordingly, for the reasons set forth herein, we affirm that portion of the PCRA court's order denying Appellant a new trial and reverse that portion granting Appellant a new penalty hearing.[31]

Justice GREENSPAN did not participate in the consideration or decision of this case.

Justice TODD joins the opinion.

**31.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor pursuant to 42 Pa.C.S. § 9711(i).

Chief Justice CASTILLE files a concurring opinion in which Justice EAKIN and McCAFFERY join.

Justice SAYLOR files a concurring and dissenting opinion.

Chief Justice CASTILLE, concurring.

I write separately primarily because I respectfully disagree with the Majority's [1] determination to reach claims of PCRA [2] counsel ineffectiveness that were not raised below. The Majority's application of a no-waiver rule to reach those claims negates both judicial issue preservation principles and the explicit terms of the PCRA, and effectively permits the litigation strategy and preferences of volunteer counsel to control whether and when issue preservation and the PCRA should be ignored. The Majority's *ad hoc* rule also raises separation of powers concerns to the extent it dismisses the PCRA's express jurisdictional and serial petition limitations. In addition, the rule, as applied by the Majority, allows favored appellants to avoid this Court's additional restrictions on serial requests for post-conviction relief. *See Commonwealth v. Lawson*, 519 Pa. 504, 549 A.2d 107, 112 (1988) ("[A] second or any subsequent post-conviction request for relief will not be entertained unless a strong *prima facie* showing is offered to demonstrate that a miscarriage of justice may have occurred."). Accordingly, I would not reach the new claims the Court reaches.[3]

1. Although Mr. Justice Baer's lead opinion is not a majority expression respecting the points of concurrence I outline below, it is a majority expression with respect to the points of joinder I indicate, as well as the mandate. Thus, it is properly referred to as a majority opinion.

2. Post Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq.*

3. The waived claims at issue, which are deemed cognizable by the Majority as sounding in the ineffective assistance of initial PCRA counsel, are discussed in the following Parts of the Majority Opinion: Part III; Part IV; the second half of Part V (*see* Majority Op. at 153–55, 971 A.2d at 1154–56); Part VI; the second half of Part VII (*id.*, at 157–59, 971 A.2d at 1157–58); and Part VIII. I do not join any of those discussions for jurisdictional and waiver reasons.

Part II of the Majority Opinion also involves a claim the Majority deems cognizable as layered ineffectiveness of PCRA counsel, deriving from a waived claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). As I explain below, that claim was entertained by the PCRA court, under unusual circumstances, and since

Although I disagree on this jurisdictional issue, I ultimately concur in the Court's mandate, which denies relief on appellant's guilt phase claims, overturns the PCRA court's grant of relief respecting the penalty phase (the subject of the Commonwealth's cross-appeal), and rejects appellant's additional penalty phase claims. I also write to address some minor, tangential points.

— I —

Appellant was represented in the PCRA court by two experienced court-appointed lawyers, who succeeded in securing him penalty phase relief. Current PCRA appeal counsel, the Defender Association of Philadelphia, Federal Court Division, Capital Habeas Corpus Unit, entered an appearance on behalf of appellant concurrently with filing a notice of appeal on July 25, 2005. The Federal Defender was not appointed by the PCRA court or any other judicial entity. Instead, the organization entered the case on its own accord and then proceeded to attempt to add new claims never raised in the PCRA petition or proceeding which is the only subject of this appeal. The circumstances, detailed more fully below, raise supervisory and jurisdictional concerns.

After the PCRA court had already decided the PCRA petition on June 23, 2005, the counseled appellant presented the court with a *pro se* motion seeking new court-appointed counsel, which was time-stamped June 30, 2005, but never filed. (Appellant nevertheless appends a copy of this non-record, *pro se* motion to his brief on appeal.) The *pro se* request complained that appellant was innocent, that PCRA counsel had not visited him in prison, investigated his case, or spoken to him about his claims, and that he wanted to raise a new claim of racial discrimination in jury selection. Appellant also appends to his brief a non-record letter addressed to the

the court essentially permitted PCRA counsel to adopt the claim post-decision, for purposes of discussion I would view it as sounding in trial counsel ineffectiveness, not PCRA counsel (layered) ineffectiveness. To the extent I join the Majority Opinion on properly reviewable claims, I will make my joinder clear below.

PCRA court from the Federal Defender, dated July 7, 2005, purportedly offering to represent appellant in the already-decided case.

The sole record reference to these non-record communications is in the transcript of a post-decisional status hearing before the PCRA court on July 11, 2005. Judge (now Madame Justice) Jane C. Greenspan noted that she had received a letter from the Federal Defender, seeking to enter the case to raise a new claim premised upon supposed racial discrimination in jury selection. The PCRA court also mentioned the *pro se* motion, and then indicated that there was no reason to appoint new counsel where appellant already had "extremely competent counsel." However, the court offered appointed counsel the opportunity to raise the racial discrimination claim, counsel did so, and the court rejected it on the merits. N.T., 7/11/2005, at 5–7. The court did not appoint the Federal Defender at that hearing, or relieve initial counsel. Two weeks later, on July 25, 2005, the Federal Defender filed a Notice of Appeal stating that it was also entering its appearance "[b]y the request and consent of the Petitioner."

In this Notice of Appeal, the Federal Defender included a Jurisdictional Statement that listed seven issues, six of which were never raised before the PCRA court. Each of the six new claims included a boilerplate allegation that "appointed post-conviction counsel were ineffective in failing to remedy these failures or to properly litigate this claim" and an equally boilerplate allegation that all prior counsel were ineffective for failing to raise the new issues. Of course, this jurisdictional statement did nothing to preserve any of these claims for appeal. Claims must be raised in the trial court; and, when an appeal is filed, preserved claims may be winnowed and renewed in a Statement of Matters Complained of on Appeal, if the trial judge requests such a Statement. *See* Pa.R.A.P. 1925. The PCRA court then filed an opinion dated August 4, 2005, which addressed appellant's racial discrimination claim, as well as the other claims actually raised before the PCRA court, but did not address the new, boilerplate issues in the Notice of Appeal.

To the extent appellant seeks review of these new claims in his appeal from the partial denial of PCRA relief, he asks this Court to sit not as a reviewing court, but as a trial court passing upon claims that amount to a serial PCRA petition that was not filed within the one-year jurisdictional limitations period mandated by the PCRA. In my view, this Court lacks jurisdiction to grant such an indulgence, and even if we had jurisdiction, I would not approve a litigation strategy that operates to build-in delay in capital cases and to work an end-around the PCRA.

— II —

Initially, I will address the supervisory issue implicated by a PCRA petitioner's *pro se* request to replace court-appointed counsel. There is no right—constitutional or otherwise—to hybrid representation. *See Commonwealth v. Ellis*, 534 Pa. 176, 626 A.2d 1137, 1139 (1993) (court should not entertain *pro se* brief on appeal where defendant is represented and counsel also files brief); *see also Commonwealth v. Rogers*, 537 Pa. 581, 645 A.2d 223, 224 (1994) (Superior Court may prohibit filing of *pro se* briefs by appellants represented by counsel on appeal). In *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 302 (1999), this Court made clear that *Ellis* applies to PCRA proceedings:

> The rationale of our decisions in *Ellis* and *Rogers* applies equally to PCRA proceedings in the Court of Common Pleas. We will not require courts considering PCRA petitions to struggle through the *pro se* filings of defendants when qualified counsel represent those defendants.

*Id.*[4] Thus, it is abundantly clear that motions from represented PCRA petitioners—including motions for replacement of court-appointed counsel—should be accepted and entertained only when filed by counsel.

4. The absence of the *pro se* motion from the docket and the record may reflect the clerk's vigilance in complying with *Ellis* and its progeny. Further, the PCRA court's discussion with appointed PCRA counsel at the July 11, 2005 hearing indicates counsel was aware of both the motion and the Federal Defender's offer to represent appellant.

Furthermore, where a right to counsel exists (in this case, it is a non-constitutional, Pennsylvania Criminal Rule-based right to counsel), a criminal defendant is not entitled to free counsel of his own choosing. *Commonwealth v. Cook,* 597 Pa. 572, 952 A.2d 594, 617 (2008); *Commonwealth v. Chumley,* 482 Pa. 626, 394 A.2d 497, 507 n. 3 (1978). The standard for replacing counsel requires some substantive showing, not mere generalized dissatisfaction:

> Pennsylvania Rule of Criminal Procedure 122(C) provides that "[a] motion for change of counsel by a defendant to whom counsel has been assigned shall not be granted except for substantial reasons." Pa.R.Crim.P. 122(C)(2). "To satisfy this standard, a defendant must demonstrate that he has an irreconcilable difference with counsel that precludes counsel from representing him." *Commonwealth v. Spotz,* 562 Pa. 498, 756 A.2d 1139, 1150 (2000).

*Cook,* 952 A.2d at 617.

Then–Judge Greenspan discussed the *pro se* motion and the Federal Defender's offer to be appointed in open court, observed that appellant was already represented by able counsel, permitted counsel to raise the single new claim appellant had faulted them for failing to raise, and ruled on the new claim. For purposes of hybrid representation concerns, the PCRA court's action was streamlined and in substantial compliance with the *Ellis* model: *i.e.,* at a single hearing, the court essentially forwarded the *pro se* motion to counsel, counsel added the claim his client faulted him for failing to raise, and the case was timely disposed of.[5]

— III —

The second issue arising from the post-decision defense maneuverings below is more substantial. By entertaining

---

5. Rule 576(A)(4) of the Rules of Criminal Procedure requires the clerk of courts to forward a *pro se* pre-trial filing by a defendant who is represented by counsel to the defendant's counsel and the attorney for the Commonwealth within ten days of receipt of the filing. While appellant's *pro se* motion in this instance was not a pre-trial filing, the PCRA court essentially followed the principle embraced in Rule 576(A)(4) by addressing the motion with appellant's counsel.

appellant's post-decisional complaint, and allowing counsel to adopt it, the PCRA court in essence approved a second collateral attack, this one focusing on initial PCRA counsel, and granted appellant partial relief by allowing initial PCRA counsel to add the claim. The PCRA court did not consider whether this circumstance implicated the time and serial petition restrictions of the PCRA or the *Lawson* miscarriage of justice standard. Today's Majority goes farther, as the Court approves of a no-waiver/extra-PCRA practice of entertaining what amounts to a **third** collateral attack, initiated on direct PCRA appeal, in the form of additional complaints concerning initial PCRA counsel. The Majority thus deems reviewable as of right claims of ineffective assistance of initial PCRA counsel that were never raised in a PCRA petition, or in the proceedings below, including the proceeding where appellant was permitted to air his complaints concerning initial PCRA counsel. For purposes of this Concurrence, I will assume that the PCRA court acted properly in entertaining an additional claim post-decision. My greater concern is with the broader implication in the Majority's reaching the additional claims of PCRA counsel ineffectiveness raised for the first time on this appeal. Respectfully, I believe these claims are waived and are subject to the time and serial petition provisions of the PCRA, as well as this Court's serial petition jurisprudence.

— A —

This Court does not sit as a court of original jurisdiction on PCRA appeals, *see* 42 Pa.C.S. § 9545(a), but as an appellate court whose duty is to review the trial-level proceedings below. It is a settled and salutary principle of appellate review that we will not reach claims that were not raised below. *See* Pa.R.A.P. 302(a); *Commonwealth v. Wharton,* 584 Pa. 576, 886 A.2d 1120, 1126 (2005); *Commonwealth v. May,* 584 Pa. 640, 887 A.2d 750, 761 (2005). The issue preservation principle applies no less on PCRA appeals. *See, e.g., Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 601 (2007) (claim raised for first time on motion for reconsidera-

tion of PCRA court's dismissal of PCRA petition is waived); *Commonwealth v. Rainey,* 593 Pa. 67, 928 A.2d 215, 226 (2007) (claims not raised in PCRA petition are waived); *Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268, 278 (2006) (same). Moreover, this Court abrogated the discretionary "relaxed waiver" rule—a rule formulated before legislative adoption of PCRA time and serial petition restrictions—that formerly applied in capital PCRA appeals. *See Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693 (1998). We did so because, *inter alia,* the doctrine could be abused to foreclose finality in capital cases, and because it conflicted with the PCRA's clear waiver provision. *Id.* at 700. Independently of the tension between the PCRA and a discretionary judicial doctrine that would permit courts to ignore waiver, experience has revealed multiple deficiencies in relaxed waiver as a jurisprudential matter. This Court outlined some of those difficulties in the direct appeal context in *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), and many of those difficulties are no less troubling in the PCRA appeal context:

> This Court often is required to decide such issues without the benefit of a trial court opinion or other indication of the trial judge's view. . . .
>
> * * * *
>
> At the same time this Court, of necessity, is frequently obliged to consider matters outside of the record when reaching a claim under relaxed waiver. When a claim has not been raised in the trial court there is often a scant or insufficient record for appellate review. . . . The record will be devoid of relevant, contemporaneous arguments from the . . . attorneys, who were in the best position to advocate the merits of the matter when it arose—particularly with respect to the harmfulness or curability of an objectionable event, a matter which appears in a very different light before a verdict has been returned. After-the-fact reconstructions, non-record sources, and averments in appellate briefs are distinctly inferior to review of record objections,

arguments, and remedial requests actually and timely forwarded and decided by the trial court.

In a similar vein, relaxed waiver practice often requires the Court to engage in speculation concerning the reasons for the trial judge's action or inaction—or, to put it more accurately, to speculate as to what the judge would have done if an objection had been made—without benefit of the jurist's actual ruling or thinking in the context of the trial as it was unfolding.... Explanations proffered in after-the-fact opinions, appellate briefs, or affidavits are hardly an adequate substitute for such a contemporaneous record.

The relaxed waiver rule also presents its own unique jurisprudential problems. The doctrine obliges this Court to view many claims in an academic, artificial, or misleading fashion....

*Id.* at 394–96.

With cases such as *Albrecht, Freeman,* and *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), this Court has ensured a more rational review process, one which also respects the restrictions and purpose of the PCRA. The review paradigm now in place recognizes the centrality of the PCRA trial proceeding as the proper initial repository for collateral claims, and restores appellate courts to their role as courts of review, not as courts of original jurisdiction for claims never raised below. Serial PCRA petitions should be rare and limited to extraordinary situations, such as are contemplated as the statute's time-bar exceptions. Because appellant's boilerplate, hindsight claims sounding in the ineffectiveness of PCRA counsel were not raised below, they clearly are waived and unavailable on this appeal.

Such new claims are also beyond this Court's jurisdiction. The PCRA time-bar plainly provides that: "(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final," unless the petitioner proves one or more of three narrow exceptions to the time-bar. 42 Pa.C.S. § 9543(b)(1). Notably, there is no exception devoted to claims

of PCRA counsel ineffectiveness, and this Court has consistently held that claims of ineffectiveness of PCRA counsel will not overcome the timeliness requirements of the PCRA because defense counsel are not "government officials." *See Commonwealth v. Wharton*, 584 Pa. 576, 886 A.2d 1120, 1127 (2005) (citing *Commonwealth v. Pursell*, 561 Pa. 214, 749 A.2d 911, 915–16 (2000); *Commonwealth v. Gamboa–Taylor*, 562 Pa. 70, 753 A.2d 780, 785–86 (2000); *Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585, 589 (2000)).

The PCRA time-bar is jurisdictional and this Court has emphasized the consequences of that fact:

"This Court has repeatedly stated that the PCRA timeliness requirements are jurisdictional in nature and, accordingly, a PCRA court cannot hear untimely PCRA petitions." [*Commonwealth v.*] *Rienzi*, 573 Pa. 503, 827 A.2d [369,] 371 [ (2003) ]. *See also [Commonwealth v.] Hall*, 565 Pa. 92, 771 A.2d [1232,] 1234 [ (2001) ] ("Pennsylvania courts lack jurisdiction to entertain untimely PCRA petitions"). In addition, we have noted that "[t]he PCRA confers no authority upon this Court to fashion *ad hoc* equitable exceptions to the PCRA time-bar in addition to those exceptions expressly delineated in the Act." [*Commonwealth v.*] *Eller*, 569 Pa. 622, 807 A.2d [838,] 845 [ (2002) ]. *See also [Commonwealth v.] Fahy*, 558 Pa. 313, 737 A.2d [214,] 222 [ (1999) ] ("a court has no authority to extend filing periods except as the statute permits"). We have also recognized that the PCRA's time restriction is constitutionally valid. *Commonwealth v. Peterkin*, 554 Pa. 547, 722 A.2d 638, 642–43 (1998).

*Commonwealth v. Robinson*, 575 Pa. 500, 837 A.2d 1157, 1161 (2003). In PCRA terms (and this is a PCRA appeal), the new claims appellant would raise comprise a serial PCRA petition. The claims were not raised in the initial or amended petition, nor were they raised in the post-decision proceeding where the PCRA court permitted appellant to challenge the performance of his PCRA counsel. The new claims therefore must be subject to the strictures of the PCRA, and this Court lacks authority to ignore the statute, or to fashion *ad hoc* extra-statutory exceptions to defeat it. *See Commonwealth v. Bond,*

572 Pa. 588, 819 A.2d 33, 52 (2002) ("Permitting a PCRA petitioner to append new claims to the appeal already on review would wrongly subvert the time limitation and serial petition restrictions of the PCRA.") (citing *Commonwealth v. Lark,* 560 Pa. 487, 746 A.2d 585, 587–88 (2000)); *accord Commonwealth v. Hall,* 582 Pa. 526, 872 A.2d 1177, 1182 (2005) ("[P]ursuant to [*Albrecht,*] the relaxed waiver rule is no longer applicable to PCRA appeals, and therefore, any claims that have been waived by Appellant **are beyond the power of this Court to review** under the terms of the PCRA.") (emphasis supplied).

— B —

The Majority justifies overlooking the waiver of certain claims and ignoring the PCRA by declaring that "a defendant in a capital case may challenge the stewardship of PCRA counsel on appeal to this Court because it is his only opportunity to do so," Majority Op. at 126, 971 A.2d at 1138 (citing to *Hall, supra, Pursell, supra,* and *Albrecht, supra* ), and noting that *Albrecht* "recognized that Pa.R.Crim.P. 904 embodies an enforceable right to effective PCRA counsel in a first PCRA petition and therefore we must permit claims challenging PCRA counsel's stewardship in an appeal to this Court." *Id.* I do not believe these broad statements are sufficient justification to ignore waiver and enjoin the PCRA, particularly given that developments in our case law since *Albrecht* have squared judicial doctrine with a rational collateral review scheme and thereby come to recognize the legitimacy of the PCRA.

First, and most fundamentally, nothing in the text of the PCRA suggests that it may be ignored to indulge new appellate claims sounding in PCRA counsel ineffectiveness, which amount to a serial petition. Indeed, it would be perverse to enjoin the statute to address claims of collateral counsel ineffectiveness, since no constitutional right is implicated.

Second, in evaluating the legitimacy and persuasiveness of the *Albrecht* dictum, which was repeated in *Hall,* the context in which those assumptions were announced must be considered. *Albrecht* and *Pursell* were decided, and *Hall* was

litigated below and briefed here, before *Commonwealth v. Grant* was decided. Before *Grant,* the prevailing **judicial** rule under *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977) and its progeny commanded that claims of ineffective assistance of counsel had to be raised, upon pain of waiver, at the first opportunity when new counsel entered a case—including when new counsel entered on PCRA collateral appeal. The comments in the pre-*Grant* cases must be understood in light of that reality.

I first questioned the effect of *Hubbard* upon the PCRA's jurisdictional restrictions in my Opinion Announcing the Judgment of the Court ("OAJC") in *Commonwealth v. Jones,* 572 Pa. 343, 815 A.2d 598 (2002) (Castille, J., joined by Eakin, J.). In *Jones,* the capital appellant included in his brief to this Court a second, non-record amended PCRA petition that included claims not raised before the PCRA court. In my OAJC, I cited *Pursell* and *Albrecht* and noted the *Hubbard*-based reason why, as a matter of judicial issue preservation, we permitted claims of ineffectiveness to be raised outside the confines of the PCRA:

> This exception to the general rule of issue preservation is a necessary consequence of this Court's requirement that "claims of ineffectiveness must be raised at the earliest possible stage in the proceedings at which counsel whose effectiveness is questioned no longer represents the defendant." *Commonwealth v. Green,* 551 Pa. 88, 709 A.2d 382, 384 (1998); *see also Commonwealth v. Kenney,* 557 Pa. 195, 732 A.2d 1161, 1164 (1999); *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687, 695 n. 6 (1977). Obviously, if new counsel is *required* to raise claims of predecessor counsel ineffectiveness upon appeal, upon pain of judicial waiver, the appellate court must be prepared to entertain those claims. Thus, as a matter of this Court's appellate jurisprudence, "a properly layered claim challenging PCRA counsel's ineffectiveness would not be waived, and can be reviewed on appeal from the denial of the PCRA petition." *Pursell I,* 724 A.2d at 303 & n. 7 (characterizing *Albrecht, supra* ).

*Jones*, 815 A.2d at 609. I went on to note that there was an "obvious tension" between that judicial doctrine and the PCRA's new jurisdictional limitations:

> The claims of PCRA counsel ineffectiveness here, which are properly subject to review as a matter of judicial issue preservation under the *Hubbard* doctrine, were, with but two exceptions, not raised in the original or amended PCRA petition that is the subject of this appeal. Nor are the new claims elaborations, extensions, or derivations of those raised in the petitions below. Instead, appellant's new and distinct claims were first raised in an appellate brief filed on November 8, 1999, well over a year after appellant's conviction became final in 1996. As a PCRA matter, then, these issues, not having been raised in the initial and amended petitions below, should properly be the subject of a second PCRA petition, which would be subject to the time limitation and serial petition restrictions contained in § 9545(b) of the PCRA. By reaching the merits of brand new claims never presented in the PCRA petition that was actually filed and is at issue in this appeal, this Court arguably employs the *Hubbard* doctrine in an unintended and improper fashion—*i.e.*, to provide an end-around the General Assembly's unequivocal and jurisdictional restrictions upon serial post-conviction petitions.

*Id.* at 610.

The legal landscape has changed since my observations in *Jones*. Most importantly, this Court overruled *Hubbard* in *Grant*, thereby relieving new counsel of the obligation to raise ineffective assistance claims at the first opportunity. *Grant*, 813 A.2d at 738. In light of *Grant*, no **judicial** waiver results from a failure to raise ineffectiveness claims at the first opportunity. What remains is the normal appellate review/issue preservation paradigm, and the strictures of the PCRA. The *Hubbard*-based "only opportunity to do so" rationale for entertaining new claims outside the strictures of the PCRA having been corrected, it is time for this Court to permit the PCRA to operate as it is clearly intended.

— C —

Of course, there was more to *Albrecht* than a *Hubbard* concern; there was, also, a sentiment that there must be some safeguard of the "enforceable" right to PCRA counsel. But, that avenue cannot be creation of an extra-statutory, "as-of-right" ability to litigate a new, unlimited, and essentially serial PCRA petition on PCRA appeal, merely because new counsel time their appearance into the case that way. Again, the PCRA does not provide such an exception. Moreover, the "avenue" deriving from the *Albrecht* dictum is arbitrary. Not all capital PCRA petitioners, and very few non-capital petitioners, want new counsel, secure new counsel or have new counsel volunteer so as to permit PCRA appeal "vindication" of their right to PCRA counsel. Instead, it is only the well-to-do petitioner or the indigent petitioner favored by an organization such as the Federal Defender who will be able to avail himself of this *ad hoc* exception.

The Majority responds by arguing that its rule—allowing for as-of-right review of an untimely, serial PCRA petition initiated on direct appeal in those select cases where new counsel has entered the case—is "the only way" ("there is no viable alternative") to vindicate the right to effective PCRA counsel, is "the only way to bring final resolution to these case[s]," "is essential to preserve an enforceable right to effective PCRA counsel," and keeps the Court from "perpetrating little more than a myth that the right to effective PCRA counsel exists." But the Majority overlooks how arbitrary the rule is. The rule does **nothing** to vindicate the right to effective PCRA counsel for the overwhelming majority of defendants, in capital and non-capital cases alike, who do not have new counsel on PCRA appeal. If those defendants believe their PCRA counsel were ineffective, they are faced with the time and serial petition restrictions of the PCRA, as well as the *Lawson* standard.

There is an obvious course that would allow for full, rather than select, vindication of the right to effective PCRA counsel: (1) permit all defendants to pursue a second PCRA petition as

of right. But the PCRA does not authorize that path. If the Court were to authorize such a course explicitly, the question squarely would arise: by what power could (or should) the Court essentially rewrite the PCRA? The Majority's half-measure allows the Court to maintain the pretense that it is not flouting the statute, when in fact we are flouting it, but in an incomplete and arbitrary way. Ultimately, the Majority's embrace of a select reinstitution of relaxed waiver, to indulge the pretense that we are not flouting statutory command, avoids the harder separation of powers question.

In my view, *Hubbard* having been corrected, there is no legitimate reason to ignore waiver principles and the PCRA's restrictions on serial petitions. Moreover, the notion that there must be some formalized, PCRA-like procedure for vindication of claims of PCRA counsel ineffectiveness, if taken to its logical conclusion, would require approval of an infinite series of collateral attacks. After all, how can the right to PCRA counsel be deemed vindicated if PCRA appeal counsel himself was incompetent, unless there is an easy avenue to attack PCRA appeal counsel? As this case reveals, where one collateral attack fails in whole or in part in a capital case, a motivated lawyer always seems to materialize who is willing to blame all preceding counsel for failing to raise some other claim or claims.

Furthermore, this Court would be naïve not to recognize that allowing volunteer counsel to self-time their entry into a case so as to trigger a judicially-created "exception" to a statutory jurisdictional bar creates an incentive for those who may be inclined to employ a delay-oriented litigation strategy. *See, e.g., Commonwealth v. Sam*, 597 Pa. 523, 952 A.2d 565, 577 (2008). Even aside from the prospect of the delay that would attend any remand that the new claims may require, it takes a great expenditure of time and judicial resources to brief and decide a case when new claims are raised and there is no record, nor is there a lower court decision to review. Moreover, if an additional layer of collateral review truly is of-right, as the Majority now says is the case when new counsel volunteers on appeal, then there is no defense downside in

volunteer counsel waiting until the PCRA appeal stage to enter the case: all issues properly litigated below will still be available, but counsel can secure the added benefit of the additional review, and ineluctable delay, litigation of the new claims will entail. Nor would there be a downside for volunteer counsel to parcel out, piecemeal, a single claim or many claims time after time.

The Federal Defender apparently is not answerable to this Court, or to any other Pennsylvania Commonwealth entity, concerning whether and when it will volunteer itself into a state court capital litigation proceeding. The Federal Defender also apparently has sufficient resources to pick and choose which cases to enter and when.[6] Thus, the Federal Defender's Capital Habeas Unit frequently represents capital defendants at the PCRA trial level and on PCRA appeal. However, this Court has also seen the Federal Defender's lawyers, or those lawyers when affiliated with predecessor organizations, initiate a PCRA proceeding without the request or consent of the defendant, *see Commonwealth v. Sam, supra;* file a PCRA appeal against a former client's express directive, *see Commonwealth v. Saranchak,* 570 Pa. 521, 810 A.2d 1197 (2002); render substantial or controlling assistance to PCRA counsel of record, *see Commonwealth v. Steele,* 599 Pa. 341, 961 A.2d 786, 835–38 (2008) (Castille, C.J., joined by McCaffery, J., concurring); and, as here, enter a case upon PCRA appeal and then attempt to assert new claims sounding in PCRA counsel ineffectiveness. *See, e.g., Commonwealth v. Hawkins,* 567 Pa. 310, 787 A.2d 292, 296 (2001); *id.* at 309 (Castille, J., concurring). I would not turn askance and allow the Federal Defender's litigation strategy to determine the availability, timing, conditions, and scope of extra-statutory, serial collateral capital review in Pennsylvania. No statute, rule, constitutional provision, or jurisprudential precept commands that indulgence; and the PCRA requires otherwise. If

6. According to a recent article in The Legal Intelligencer, the size of the Federal Defender's capital habeas unit has ballooned from three lawyers in 1996 to "to 36 lawyers and an overall staff of 83" today. Shannon P. Duffy, *Skipper is New Chief Federal Defender,* THE LEGAL INTELLIGENCER, Dec. 2, 2008, at 1.

the Federal Defender "wants in" in state capital litigation, it should timely "volunteer" itself at the PCRA trial level.

Even aside from these general concerns, this case is an inappropriate one to invoke the *Albrecht* "only opportunity" dictum. This is so because appellant was permitted to collaterally attack his PCRA counsel at the status listing in July 2005, where the PCRA court permitted him to add a claim, even though his petition had already been decided. The new claims appellant now seeks to litigate on this appeal amounts to a **second** attack upon initial PCRA counsel, and a third PCRA petition overall. Nothing in the dictum in the *Albrecht* line requires this sort of indulgence and flouting of the PCRA.

— D —

Finally, with respect to the residual question of how the right to effective PCRA counsel can be "enforced" short of the end-around the PCRA the Majority approves, I offer the following. Capital PCRA proceedings generally are presided over by careful, trained, experienced trial judges. Oftentimes it is the same judge who presided over the petitioner's trial, with an intimate knowledge of the facts of the petitioner's case, as well as the best view of the performance of the petitioner's various lawyers. The Rules of Criminal Procedure now also require that PCRA counsel meet exacting educational and experiential requirements. *See* Pa.R.Crim.P. 801 (Qualifications for Defense Counsel in Capital Cases); Pa.R.Crim.P. 904, cmt. An involved PCRA judge is well-positioned to assess whether PCRA counsel is performing competently; just as Judge Greenspan was called upon to do in this case. The PCRA judge can direct counsel to amend or further develop claims, can conduct colloquies with the defendant, and can easily assess whether counsel is adequately discharging his duty. Denials of relief in capital PCRA cases are then appealable as of right to this Court, which is also in a position, although from a different perspective, to assess the sort of effort counsel has made, and to take corrective action where it appears counsel has not competently discharged his duties. This role for the courts is not unusual: in the context

of counsel withdrawal, the courts are routinely called upon to assess counsel's discharge of his duties to criminal defendants. See *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *Commonwealth v. Turner,* 518 Pa. 491, 544 A.2d 927 (1988); *Commonwealth v. Finley,* 379 Pa.Super. 390, 550 A.2d 213 (1988).

Unlike the Sixth Amendment trial right to counsel or the right to counsel on a direct appeal as of right, which are usually the focus of a first collateral attack, the Rule-based right to counsel at the PCRA stage does not have a constitutional dimension. *See Albrecht,* 720 A.2d at 699; *Commonwealth v. Turner,* 518 Pa. 491, 544 A.2d 927, 927–28 (1988). Thus, for example, appointed counsel on collateral attack "possesses the prerogative of declining to litigate a meritless petition," *Albrecht,* and may withdraw via "a procedure which is less cumbersome" than the *Anders* procedure applicable on direct review, *see Turner,* 544 A.2d at 927, albeit "counsel's decision in this regard is subject to exacting judicial review." *Albrecht.* There is no requirement or need to afford a procedure for the sort of prolix, "everything-and-the-kitchen-sink" pleadings that we see in an of-right first capital PCRA petition. PCRA counsel are permitted to bring their professional judgment to bear as to which potential claims to pursue in light of the limitations attending any collateral attack, and an "enforceable" right to PCRA counsel does not require affording a second, full-blown avenue of review, in order to indulge a second (or a third, a fourth, etc.) list of complaints.

Because the right to counsel at this stage is both attenuated and not constitutionally commanded, it is also problematic to simply assume, as appellant and some of this Court's prior cases have,[7] that PCRA counsel's conduct is measured by the Sixth Amendment standard of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987), rather than a less exacting test. On the question of an appropriate standard to enforce this Court's Rule-based right to counsel,

7. *See, e.g., Hawkins,* 787 A.2d at 296; *Pursell,* 724 A.2d at 304.

Mr. Justice Saylor's discussion in *Commonwealth v. Priovolos,* 552 Pa. 364, 715 A.2d 420 (1998), is instructive:

It is generally true that a petitioner has no federal constitutional right to counsel in a state collateral proceeding.... Moreover, in accordance with decisions of the United States Supreme Court, it follows that an asserted deprivation of effective assistance of counsel on state collateral review does not generally state a claim for relief under the United States Constitution.... This Court, however, has not decided whether a right to effective assistance of post-conviction counsel would accrue under the Pennsylvania Constitution....

Even if Priovolos' assertion of a right to effective counsel lacks a constitutional dimension, the right to counsel at issue is accorded by Pennsylvania Rule of Criminal Procedure 1504(a) [now renumbered Rule 904] to an indigent petitioner who, like Priovolos, is proceeding on his first PCRA petition. **This Court has recognized both that appointed counsel must discharge the responsibilities under the rule and that a remedy may be fashioned where counsel fails to do so.** *See, e.g., Commonwealth v. Sangricco,* 490 Pa. 126, 133, 415 A.2d 65, 68–69 (1980).

715 A.2d at 421–22 (additional citations and footnote omitted) (emphasis added). This more flexible formulation, tied to the purpose of the Rule that creates the right to counsel, seems like the appropriate test and squares with the notion of a vigilant court, as outlined above.

The Majority dismisses this approach as "inadequate." Instead, the Majority assumes that full-blown, Sixth Amendment *Strickland* review of claims of PCRA ineffectiveness is required. Even if that were so, the Majority's rule overlooks this Court's jurisprudence concerning serial post-conviction requests for relief. *In Commonwealth v. Lawson,* this Court, in an effort to short-circuit abusive, serial PCRA petitions and to promote finality, held that "a second or any subsequent post-conviction **request for relief** will not be entertained unless a strong *prima facie* showing is offered to demonstrate that a miscarriage of justice may have occurred." 549 A.2d at

112 (emphasis supplied). The new claims raised in this appeal obviously comprise a second or subsequent post-conviction request for relief. A meritorious *Strickland* showing alone would not necessarily be grounds for relief under *Lawson*.

In any event, it cannot be enough to simply allege, as appellant does here, that PCRA counsel should be deemed *per se* ineffective merely because he did not raise a claim that current counsel feels has merit. *See Hawkins*, 787 A.2d at 310 (Castille, J., concurring) (addressing burden to actually prove ineffectiveness). As the Lawson Court recognized, there must be finality and I, for one, believe the review scheme approved by the PCRA, combined with the vigilance of the courts, suffices to draw the line fairly.

— IV —

I write next concerning appellant's belated *Batson*-derivative claim. I join the Majority's analysis, and add the following observations. First, I note that the Court of Appeals for the Third Circuit has come to agree with this Court that the nature of a *Batson* claim requires a contemporaneous objection, if the defendant is to enjoy the *Batson prima facie* case standard and burden-shifting formula. *See Abu–Jamal v. Horn*, 520 F.3d 272, 283–84 (3d Cir.2008). Thus, as the Majority notes, a petitioner on collateral attack, assailing trial counsel, must prove actual, purposeful discrimination. *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 87 (2004) ("[I]n order to succeed on an unpreserved claim of racial discrimination in jury selection . . . a post-conviction petitioner may not rely on a *prima facie* case under *Batson*, but must prove actual, purposeful discrimination by a preponderance of the evidence in addition to all other requirements essential to overcome the waiver of the underlying claim.") (citation omitted). *See also Commonwealth v. Collins*, 598 Pa. 397, 957 A.2d 237, 259 (2008).

Second, on the merits, it bears emphasis that appellant used at least fifteen of his twenty peremptory challenges to exclude white venirepersons—a pattern of strikes that might raise an

inference of his own discriminatory intent. This Court is routinely presented with collateral *Batson* claims where the defense argues the Commonwealth's supposedly revealing "strike rate" without accounting for the skewing of the jury pool resulting from the defendant's own pattern of strikes. "A true assessment of strikes must account for the composition of the panel as a whole, and the conduct of other lawyers exercising strikes. It must be remembered that *Batson* works both ways: the right of jurors being at issue, neither the defense nor the prosecution may discriminate, and discriminating actions of one side, if unaccounted for, result in an incomplete picture." *Commonwealth v. Hackett*, 598 Pa. 350, 956 A.2d 978, 991 (2008) (Castille, C.J., concurring). This reality, as borne out by the possibly discriminatory defense strikes here, underscores the propriety and common sense of this Court's holding in *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176, 1182 (1993), that *Batson* review requires a consideration of the totality of the circumstances. It also exposes the limitations of the Third Circuit decision in *Holloway v. Horn*, 355 F.3d 707 (3rd Cir.2004), *cert. denied, Beard v. Holloway*, 543 U.S. 976, 125 S.Ct. 410, 160 L.Ed.2d 352 (2004), which criticized our requirement that a defendant raising a *Batson* claim present a record identifying the race of the venirepersons struck by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the jury selected. *See Uderra*, 862 A.2d at 83.

Third, the Majority correctly rejects appellant's reliance on *Hardcastle v. Horn*, 521 F.Supp.2d 388 (E.D.Pa.2007), a case from which appellant constructs an *ad hominem* attack on the integrity of the trial prosecutor in this case. The trial prosecutor in *Hardcastle* did nothing improper under the law in existence when that jury was selected in 1982. *Batson* changed the law four years later. *Batson* relief was granted to Hardcastle because the federal courts felt that he had anticipated *Batson* and preserved a *Batson*-type objection. Hardcastle's windfall says nothing of the trial prosecutor's adherence to *Batson* once that case actually came into exis-

tence, much less does the case support appellant's counsel's current intemperate accusations.

— V —

With respect to the penalty phase (Parts V through VIII of the Majority Opinion), I join the first half of Part V (*see* Majority Op. at 143–54, 971 A.2d at 1148–55), which is the subject of the Commonwealth's cross-appeal. (The second half addresses appellant's waived new argument sounding in PCRA counsel ineffectiveness.) Part V involves the alleged ineffectiveness of trial counsel respecting preparation and presentation of mitigation evidence. I write merely to reiterate my view regarding the limited applicability of decisions such as *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), to trials concluded before those decisions were announced. *See Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1152–55 (2008) (Castille, C.J., concurring). Finally, I join the first half of Part VII, involving alleged prosecutorial misconduct, *see* Majority Op. at 155–58, 971 A.2d at 1156–57, but not the second half, which considers another waived claim.

Justice EAKIN and McCAFFERY join this opinion.

Justice SAYLOR, concurring and dissenting.

I join parts I through IV, VI, and VIII of the Majority Opinion, concur in the result with respect to Part VII, and dissent relative to Part V.

As to Part V (concerning the mitigation-related claims), in the first instance, I would credit the PCRA court with identifying deficient stewardship on the part of trial counsel. I read the relevant line of United States Supreme Court decisions as requiring capital counsel, as a general rule, to assemble at least the reasonably available, basic life-history records. I also believe the PCRA court's finding that trial counsel did not fulfill this responsibility in this case is supported by the record. To the extent PCRA counsel did not present suffi-

cient evidence to establish the wider range of available records not collected by trial counsel, *see* Majority Opinion, at 143–44 n. 23, 971 A.2d at 1149 & n. 23, this suggests deficient stewardship on their part as well.

Some additional perspective arises from review of a declaration from the mitigation expert who testified at the penalty hearing, Dr. Tepper.[1] The proffer is as follows: Dr. Tepper was first contacted by trial counsel one week before trial and was able to meet with Appellant for the first time the day before he testified. Dr. Tepper repeatedly requested life-history records, but was never provided with Appellant's medical records, juvenile file, prison report, or complete school records. Faced with a "dearth of background information" and "severely constrained circumstances," Dr. Tepper had "great difficulty" in his evaluation; performed only brief intelligence testing; did not unearth available evidence suggestive of organic brain impairment; failed to recommend neuropsychological testing which he would have advocated had he been properly prepared; and, thus, was unable to incorporate material findings of full scale borderline intellectual functioning and organic brain impairment into his testimony. Appendix to Brief for Appellant, at Tab 7.[2]

I also differ with the majority's conclusion that the evidence stipulated to by the Commonwealth (in the form of Dr. Heilbrun's report), and that offered by present counsel (the submissions of Drs. Tepper and Mack) is not qualitatively different from that presented at trial. As the majority explains, Dr. Tepper testified at the penalty stage that Appellant demonstrated average intellect and no serious mental health

---

1. Although the majority indicates the declaration is unsigned, the copy in the appendix provided with Appellant's brief appears to contain a signature.

2. In terms of the effectiveness of PCRA counsel, Dr. Tepper was an obvious source of potentially helpful evidence at the post-conviction stage. Thus, if the above-described declaration is accurate, it bears on PCRA counsel's stewardship, since they did not seek to introduce such helpful information into the record. For this and other reasons arising from a review of the transcript of the very brief PCRA hearing, and in the absence of a hearing on the effectiveness of PCRA counsel, I do not support the majority's couching of their performance as laudatory at this juncture. *See* Majority Opinion, at 154, 971 A.2d at 1155.

disorder or organic brain impairment. *See* Majority Opinion, at 148–49, 971 A.2d at 1152. However, the stipulated post-conviction evidence shows full scale borderline intellectual functioning, and the proffer on appeal, if believed, demonstrates brain damage, resultant dementia characterized as an Axis I clinical disorder per the Diagnostic and Statistical Manual of Mental Disorders IV, and Axis I psychiatric disorders. Further, an opinion is presented that, combined with Appellant's age (at the time of his crimes) of nineteen years, the conditions substantially impacted on his reasoning, thought processes, and judgment. This evidence seems to me to much more clearly implicate what the United States Supreme Court has characterized as "the belief, long held by this society, that defendants who commit acts that are attributable to ... emotional and mental problems may be less culpable than defendants who have no such excuse," *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989), compared with what Dr. Tepper apparently regards as his effort to make the best of an untenable situation at the penalty hearing. Respectfully, I have great difficulty with the majority's perspective that a finding of brain damage and Axis I clinical disorders is "different, but not more extensive mitigation," measured against an opinion that there is no brain damage or serious mental health issues. *See* Majority Opinion, at 154, 971 A.2d at 1155.[3]

In terms of the availability of review of the claim of ineffective assistance of PCRA counsel, I acknowledge Mr. Chief Justice Castille's concern with abuses of the post-conviction process. Nevertheless, as long as jurisdiction is secure I support the majority's holding that we are empowered to

---

**3.** Some reluctance to consider organic impairment to be substantially mitigating may arise from skepticism as to the truth of the allegation, as we are seeing such claims surface pervasively for the first time on post-conviction review. Since, however, the condition is well recognized in the medical and scientific communities and may in fact be considered by reasonable jurors to be substantially mitigating, I do not believe the appropriate response is to dilute the potential impact of this category of evidence by equating it with the sort of emotional factors described by Dr. Tepper at the penalty hearing. Rather, the evidence should be reviewed by a factfinder to assess its believability and force before it properly can be credited or discounted in terms of its material significance in capital sentencing.

address challenges to the fundamental fairness in such proceedings, either via our own immediate review (if no material factual controversies exist) or a remand (if such controversies are present). While I also favor consideration of additional measures to curb the abuses,[4] I believe that, as new measures are devised, they should be implemented prospectively and not imposed on those who are not fairly apprised.

Finally, in light of the substantially abbreviated hearing and in the absence of specific factual findings, the post-conviction proceedings seem to me to represent a well-meaning effort on the part of PCRA counsel and the PCRA court, in colloquial terms, to cut through the red tape. However, a study of this Court's decisional law over the past ten years demonstrates that, at least in the absence of extraordinary circumstances, such truncated procedures will not generate a sustainable award of state post-conviction relief in contested cases. *See, e.g., Commonwealth v. Gibson,* 597 Pa. 402, 421–22, 951 A.2d 1110, 1121–22 (2008) (discussing the present state of post-conviction jurisprudence in Pennsylvania and explaining, "particularly in close cases, a developed post-conviction record accompanied by specific factual findings and legal conclusions is an essential tool necessary to sharpen the issues so that differences at the appellate level can be mitigated").

In light of the above, I would vacate the present award of penalty relief and remand to the PCRA court for additional proceedings consistent with this opinion, including consideration of whether leave should be granted to amend the pleadings to state claims of deficient stewardship on the part of post-conviction counsel. *See* Pa.R.Crim.P. 905(A) ("The judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time. Amendment shall be freely allowed to achieve substantial justice.").

---

4. These would include a requirement for a specific proffer pertaining to claims raised on appeal and perhaps an elevated standard of review if workable.